MICHAEL T. ASHLEY, ESQ. NJ SBN 270032021
The Law Office of Thomas R. Ashley
50 Park Place, Suite 1400
Newark, NJ 07102
Telephone: 973.623.0501
Facsimile: 973.623.0329
Email: m@traesq.com

MICHAEL H. WEISS, ESQ.
PROFESSIONAL CORPORATION
Michael H. Weiss (SBN 107481)
8581 Santa Monica Blvd., #4
West Hollywood, CA 90069
Telephone: 424. 293.3237
Email: mhw@mhw-pc.com

Attorneys for JAYME BELLA, Moving Party

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>Beacon Organics, LLC,<br><br>Debtor. | Case No. 2:22-bk-11295-WB<br>Chapter 7<br><br>**JAYME BELLA'S MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MICHAEL T. ASHLEY**<br><br>Hearing Date: October 6, 2022<br>Time: 2:00 PM<br>Place: Courtroom 1375<br>    255 E. Temple St.<br>    Los Angeles, CA 90012 |

**TO THE COURT, CREDITORS AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on October 6, 2022 at 2:00pm in Courtroom 1375 of the United States Bankruptcy Court for the Central District of California, Los Angles Division, JAYME BELLA ("Movant" or "Bella"), shall and does hereby move this Court for entry of an order dismissing its Chapter 7 Bankruptcy.

The grounds for this motion are that the petitioner did not have authority to file the Chapter 7 Petition ("Petition" or "Pet.") since he did not have the approval of all members of Beacon Organics, LLC ("Beacon" or "Debtor") as required by 15 Pa.C.S.A. § 8847(c)(3)(i) and additionally, movant submits that this case should also be dismissed pursuant to Local Bankruptcy Rule (LBR) 1017-2(a)(1) for an effective failure to file an Official Form 206A/B or amend it in a timely fashion.

The instant Motion is based upon the attached Memorandum of Points and Authorities, this Notice, the papers and pleadings previously filed in this case, those matters of which this Court may take judicial notice, the attached declaration of Michael T. Ashley, the attached Exhibits, forthcoming reply should the motion be opposed, and such other and further evidence and argument as may be presented by counsel at the time of the hearing on the Motion.  Movant expressly requests, without limitation, the relief sought herein as well as such relief as the Court may find proper.


Dated:  September 8, 2022                    The Law Office of Thomas R. Ashley
                                            Michael H. Weiss, Esq., P.C.

                                            /s/ Michael T. Ashley_____
                                            Attorneys for Jayme Bella.

## MEMORANDUM OF POINTS AND AUTHORITIES

In support of this Motion, Movant respectfully represents the following:

**I.    THE BANKRUPTCY MUST BE DISMISSED BECAUSE THE PETITIONER LACKED AUTHORITY TO ACT OUTSIDE OF THE ORDINARY COURSE OF BUSINESS ACCORDING TO PENNSYLVANIA STATE LAW**

A person filing a voluntary petition for bankruptcy on behalf of a business entity must be duly authorized to do so. <u>Price v. Gurney</u>, 324 U.S. 100, 106 (1945). If the person lacks authority, the court has no alternative but to dismiss the petition. Id. State law generally determines who has authority to file a bankruptcy petition. Id. at 106–07.

Beacon is a limited liability company created under the laws of the Commonwealth of Pennsylvania. "State law determines who has the authority to file a voluntary bankruptcy petition on behalf of a debtor. <u>Price v. Gurney</u>, 324 U.S. 100, 106–07, 65 S.Ct. 513, 89 L.Ed. 776 (1945); see also <u>Keenihan v. Heritage Press, Inc.</u>, 19 F.3d 1255, 1258 (8th Cir. 1994) ("A person filing a voluntary bankruptcy petition on a corporation's behalf must be authorized to do so, and the authorization must derive from state law."). <u>In re Sino Clean Energy, Inc.</u>, 901 F.3d 1139, 1141 (9th Cir. 2018). Accordingly, Beacon's operation and management is governed by 15 Pa.C.S.A. § 8847. Section (c)(3) of that statute provides that:

> (3) The affirmative vote or consent of all members is required:
>
> > (i) except as provided under section 325 with respect to a transaction under Chapter 3, to undertake any act outside the ordinary course of the company's activities and affairs;

Because Beacon's operating agreement is silent as to the initiation of a bankruptcy proceeding, the section above must be used to determine what person or class of persons

is lawfully authorized to file a Chapter 7 petition on behalf of the Debtor. Exhibit A.

It is submitted that the act of filing the instant petition cannot plausibly be within the ordinary course of business for the Debtor. Since the operating agreement does not provide otherwise, the consent of all members is required for the Debtor to enter into any bankruptcy proceeding. It is irrelevant that the purported members of the Board of Directors appear to have executed a resolution granting their approval. Pet. at 39. Therefore, this case must be dismissed since the unanimous membership of Beacon did not acquiesce to the instant Petition.

## II.    PETITIONER'S EFFECTIVE FAILURE TO FILE OFFICIAL FORM 206A/B WARRANTS THE DISMISSAL OF THE BANKRUPTCY

LBR 1017-2(a) provides that a case should be dismissed if the required commencement documents are not timely filed. Specifically, Section (1) states that, "failure of the person or entity who filed a petition to file in a timely manner any case commencement document required by the Bankruptcy Code, the FRBP, and these rules is grounds or "cause" for dismissal of the case." Section (3) sets out that, "[i]f the required documents are not filed within 14 days from the filing of the petition or an extension of such 14-day period granted by an order of the court, the case will be dismissed without further notice or hearing.

Appended to the Petition, is a disclaimer in which the petitioner attempts to discharge his duty to provide accurate and complete information regarding the financial affairs of the debtor. Exhibit B. The Official Form 206A/B in the Petition is completely lacking any representations whatsoever with respect to the assets of the Debtor. It is submitted that the submission of SOFA documents devoid of any financial representations are tantamount to an actual failure to submit the documents at all.

Further, the inclusion of an alleged disclaimer to absolve the petitioner of his obligations to this Court is in violation of the Bankruptcy Code, public policy, and the

interests of justice. Although this tactic is highly unusual and patently improper, such cavaler maneuvers have been addressed thoroughly by the United State Bankruptcy Court. See In re JK Harris & Co., LLC, 475 B.R. 470 (Bankr. D.S.C. 2012). In that case, the Court analyzed the issue of whether a, "[d]isclaimer in Debtors' schedules may be allowed[.]" Id. at 476. The disclaimer included in that case's petition indicated that, "it is not filed under oath and that Debtors provide no assurance that the information contained in the Amended Schedules is accurate[.] Materially, this is nearly identical to the petitioners attempt to evade the penalty of perjury in this matter. The JK Harris & Co. Court began by citing its own precedent that:

> "[A]ccuracy, honesty, and full disclosure are critical to the functioning of bankruptcy []. Therefore, debtors are responsible for disclosing an accurate and complete schedule of assets with proper values and a truthful statement of affairs in order to convey a complete and accurate portrayal of their financial situation."

> Id. at 477.

The Court goes on to remark that there is scarce caselaw regarding such disclaimers as they are highly unusual. However, there was some existing precedent as applied to individuals who have attempted to skirt their obligation to provide true and accurate information to the Internal Revenue Service. In reviewing one such case, Sloan v. Commissioner of Internal Revenue, 102 T.C. 137 (1994), aff'd, 53 F.3d 799 (7th Cir.1995), it was surmised that even if a form was otherwise accurate inclusion of an accuracy disclaimer renders it invalid because it, "does not contain information on which the substantial correctness of the self-assessment may be judged." Id. at 145. It was further noted that the, "[d]isclaimer makes unclear whether petitioner had an honest and reasonable intent to supply the information required[.]" Id.

Eventually, the <u>JK Harris & Co.</u> Court concluded that, "[i]n light of the importance of these verifications, where the inclusion of a disclaimer is opposed by a party-in-interest, especially if that party-in-interest is a fiduciary acting for the benefit of all creditors, there should be a showing of compelling circumstances to justify the use of a disclaimer in connection with the filing of schedules and statements." <u>In re JK Harris & Co.</u> at 478. In the instant case, the movant is such a party as her prior motion was supported by some 87% of all undisputed creditors.

There was a finding, "in general, that the **inclusion of a disclaimer without compelling justification is contrary to the very purpose of requiring detailed and verified schedules and statements of financial affairs and the policy of complete and accurate disclosure underlying the Bankruptcy Code and Federal Rules of Bankruptcy Procedure**. <u>In re JK Harris & Co</u> at 479. (emphasis added). There is no compelling justification in this case. The petitioner claims to have been duly elected to the Board of Directors over four months before the Petition was filed. Additionally, there is no question as to whether the SOFA is accurate, it is not. This can be concluded by any number of evaluations, but most effortlessly by reviewing the Trustee's filings in this matter where certain assets are identified.

Is the Court expected to believe that the petitioner had no knowledge of the Debtor's lease of real property or possession of equipment? These assets were responsive to Official Form A/B and ought have been disclosed to the best of the petitioners ability. This point was not lost on the <u>JK Harris & Co</u> Court. "Pursuant to its terms, a verification of the schedules through an unsworn declaration is not a guarantee of perfection. Rather, it is a declaration that the schedules are true and correct to the best of [the signer's] knowledge, information, and belief." Id. (internal quotations omitted).  With such malleability built into the declaration already, it is submitted that the disclaimer is an impotent attempt to protect the petitioner from knowing falsehoods submitted under

penalty of perjury. The Petition is fatally deficient and should be dismissed in accordance with the LBRs cited herein.

### III.    CONCLUSION

By this Motion, Movant requests the immediate entry of an order dismissing the bankruptcy without hearing or further notice consistent with the points of fact and law above. Should the Court embark on a different course, Movant, without limitation, reserves her right to reply to any opposition and request oral argument should it be allowed. Additionally, Bella requests that (1) the Court issue a declaratory judgement pursuant to Bankruptcy Rule 7001 and the Declaratory Judgment Act, 28 U.S.C. §. 2201 setting out that the petitioner lacked the requisite authority to act on behalf of the Debtor and failed to provide a sufficient factual basis that the Debtor's financial affairs warranted a Chapter 7 petition, (2) that the Court deny any request from the petitioner to amend his SOFA as he has been afforded ample time to do so already, and (3) that an evidentiary hearing be scheduled to further develop information surrounding the factual allegations herein, specifically but not exclusively the petitioner's actual knowledge of the Debtors assets, if an immediate order is not issued.

Respectfully submitted,

Dated:  September 8, 2022

The Law Office of Thomas R. Ashley
Michael H. Weiss, Esq., P.C.

/s/ Michael T. Ashley
Attorneys for Jayme Bella

## DECLARATION OF MICHAEL T. ASHLEY

I, Michael T. Ashley, declare:

1.     I am retained counsel for Jayme Bella AKA Jayme Neiburg, a codebtor in this case and a party in interest.

2.     The attached exhibits were personally complied by myself and are accurate and true representations of the documents they are professed to be.

3.     Exhibit A attached hereto, is a true and accurate depiction of the operating agreement of Beacon Organics, LLC dated May 15, 2017.

4.     Exhibit B attached hereto, is a true and accurate depiction of the disclaimer included in the Petition in this case.

5.     I have reviewed the Petition in this case and the Official Form 206 A/B represents that the Debtor has a total of $0.00 in assets.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that I executed this declaration on September 8, 2022 in Newark, New Jersey.

_____
Michael T. Ashley

**EXHIBIT A**

**LIMITED LIABILITY COMPANY**
**OPERATING AGREEMENT**
**FOR**
**BEACON ORGANICS, LLC**

**THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT** is made and entered into effective as of May 15th, 2017 by and among Beacon Organics, LLC, a Pennsylvania limited liability company (the "**Company**"), the persons executing this Agreement as of the date hereof, and each Person hereafter admitted as a Member of the Company in accordance with the provisions of this Agreement.

**W I T N E S S E T H:**

**WHEREAS**, the Company was formed as a Pennsylvania limited liability company by filing a Certificate of Organization (as may be amended from time to time) (the "**Certificate of Organization**") with the Department of State of the Commonwealth of Pennsylvania on May 2, 2017 (the "**Effective Date**"); and

**WHEREAS**, the Members (as hereinafter defined) are entering into this Agreement to set forth the manner in which the Company will operate and the rights and obligations of the Member.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and promises contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties named above, the parties to this Agreement, intending to be legally bound by this Agreement, agree as follows:

**SECTION 1**
**DEFINITIONS**

For purposes of this Agreement, the following terms shall have the following meanings:

**1.1**    "**A Units**" shall mean the units of Membership Interests in the Company designated as A Units on Schedule A hereto with the rights and restrictions set forth in this Agreement.

**1.2**    "**Act**" shall mean the Pennsylvania Uniform Limited Liability Company Act of 2016, as may be amended from time to time.

**1.3**    "**Affiliate**" shall mean (i) any Person directly or indirectly controlling, controlled by or under common control with the referenced Person; (ii) any Person that has a ten percent (10%) or more beneficial or voting interest in the referenced Person or any Person in which the referenced Person has a ten percent (10%) or more beneficial voting interest; (iii) any officer or director of or any partner or member in either the referenced Person or any Person described in (i) or (ii) above; and (iv) any Person who would be a related taxpayer to the referenced Person under Section 267 of the Code. For purposes of this definition, the term "**control**" (including "**controlling**" and "**controlled**") shall mean the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of a Person, whether through the ownership of voting interests, by contract, or otherwise.

**1.4**    "**Agreement**" shall mean this Limited Liability Company Operating Agreement.

**1.5**    "**B Units**" shall mean the units of Membership Interests in the Company designated as B Units on Schedule A hereto with the rights and restrictions set forth in this Agreement.

1.6    "**Bankruptcy**" shall be deemed to have occurred as to a Person when (i) such Person shall have commenced a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended or replaced, or under any other applicable federal or state bankruptcy or insolvency law, or (ii) a decree or order for relief under any of such laws shall have been entered by any court having jurisdiction in the premises in respect of such Person, or a receiver, liquidator, assignee, custodian, trustee or similar official shall have been appointed for such Person or any substantial part of such Person's property, or the winding-up or liquidation of such Person's affairs shall have been ordered, and in connection with the foregoing provisions of this clause (ii) either such Person shall have applied for or consented to such decree, order or appointment or such decree, order or appointment shall have continued unstayed and in effect for a period of sixty (60) days (whether or not consecutive), or (iii) such Person shall have made an assignment for the benefit of creditors, or (iv) such Person shall have generally admitted in writing the inability to pay its, his or their debts as such debts become due.

1.7    "**Board**" or "**Board of Managers**" shall mean the Board of Managers elected under the provisions of Section 5.

1.8    "**Capital Account**" as of any given date shall mean the capital contribution to the Company by a Member as adjusted from time to time pursuant to Section 7.5.

1.9    "**Capital Contribution**" shall mean the cash contributed by a Member to the Company

1.10    "**Capital Proceeds**" means the cash and/or property and/or value received by the Company in connection with any Capital Transaction but less the direct costs, investment banking fees and expenses paid to unrelated third parties by in connection with the Capital Transaction.

1.11    "**Capital Transaction**" means a sale or other disposition of Company assets not in the ordinary course of the Company's business, including without limitation, a sale of substantially all of the Assets of the Company.

1.12    "**Cash Flow**" shall mean the Company's cash receipts in a particular Operating Year, less the amount of the Company's cash expenditures paid or payable with respect to such Operating Year and reasonable reserves for contingent and future liabilities and distributions of the Company, as determined by the Board in its reasonable business judgment, and less the tax distributions made to the Members pursuant to Section 8.1.   Notwithstanding the foregoing, the term "Cash Flow" shall not include the amount of proceeds from: (i) Capital Contributions, and (ii) a Sale of Assets, and shall not be reduced by any cash expenditures paid or payable with the proceeds from (i) or (ii) herein or charged against or paid out of reserve funds.

1.13    "**Certificate of Organization**" shall have the meaning set forth in the Recitals.

1.14    "**Code**" shall mean the Internal Revenue Code of 1986, as it may be amended or replaced from time to time.

1.15    "**Company**" shall have the meaning set forth in the Introduction.

1.16    "**Company Minimum Gain**" shall mean the aggregate amount of gain determined under Treasury Regulation Section 1.704-2(d).

1.17    "**Deemed Liquidation**" shall mean a sale of all or substantially all the assets or the ownership interests of the Company or merger of the Company into or consolidation with any other entity

(other than a wholly-owned subsidiary of the Company) or any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Company is disposed of.

**1.18** "**Disability**" shall mean the inability of a Member to perform a significant portion of the duties performed by such Member for the Company immediately prior to the inception of such disability and such disability has continued for six (6) months within any twelve (12) consecutive month period. The determination as to whether a Member is Disabled pursuant to the foregoing definition shall be made by a medical doctor jointly selected by the duly authorized representative of such Member and the Board of Managers. In the event there is an inability to agree upon a medical doctor to make such determination, the determination shall be made by a medical doctor selected by the Medical Society nearest to the main office of the Company and the cost of such determination, in any case, shall be borne by the Company.

**1.19** "**Distribution Threshold**" shall mean the fair market value of the Membership Interests at the time of granting of a Profits Interest Unit, as determined by the Board.

**1.20** "**Effective Date**" shall have the meaning set forth in the Recitals.

**1.21** "**Enterprise Value**" means the enterprise value of the Company as determined by a professional third party business valuation firm selected by the Board.

**1.22** "**Events of Dissolution**" shall have the meaning given in <u>Section 11.1</u>.

**1.23** "**Fair Market Value**" means, as of the date of determination, the most probable value that would be paid for a Unit in a single arm's-length transaction between a willing buyer and a willing seller, and assuming full disclosure of all relevant information and three (3) months for effectuating such sale in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably. No minority or other discount shall be applied in arriving at such valuation.

**1.24** "**Liquidating Trustee**" shall have the meaning given in <u>Section 11.2</u>.

**1.25** "**Majority Vote**" shall mean the affirmative vote or written consent of the Members holding a majority of the Preferred Units and the Members holding a majority of the A Units each voting as a separate class.

**1.26** "**Member**" shall mean each of the parties hereto and any Person hereafter admitted as a Member of the Company in accordance with the provisions of this Agreement.

**1.27** "**Membership Interest**" shall refer to a Member's entire right, title and interest in the Company and shall include a Member's right to share in the Profits and Losses, the right to receive distributions of Company assets and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the Act. A Member's Membership Interest is sometimes expressed in reference to a Member's Preferred Units, A Units, B Units, and/or Profits Interest Units.

**1.28** "**Member Minimum Gain**" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

3

**1.29**    "**Member Nonrecourse Debt**" shall have the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

**1.30**    "**Net Liquidation Proceeds**" is defined in Section 11.2.

**1.31**    "**Net Proceeds**" means (i) with respect to a Stock Sale, the gross amount received by the Members as a group less the direct costs, investment banking fees and expenses paid to unrelated third parties by in connection with the Stock Sale; and (ii) with respect to an Event of Dissolution, the Net Liquidation Proceeds.

**1.32**    "**Net Profits**" or "**Net Losses**" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

      i.    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section 1.29 shall be added to such taxable income or loss;

      ii.    Any expenditure of the Company described in Code Section 705(a)(2)(B) or treated as a Code Section 705(a)(2)(B) expenditure pursuant to Regulations Section 1.704-1(b)(2)(iv)*(i)*, and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section 1.29, shall be subtracted from such taxable income or loss;

      iii.    Gain or loss resulting from any disposition of Company Assets where such gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company Assets disposed of, notwithstanding that the adjusted tax basis of such Company Assets differs from its Gross Asset Value;

      iv.    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year;

      v.    To the extent an adjustment to the adjusted tax basis of any asset included in Company Assets pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)*(m)(4)* to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for the purposes of computing Net Profits and Net Losses;

      vi.    If the Gross Asset Value of any Company Asset, the amount of such adjustment shall be taken into account in the taxable year of such adjustment as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses; and

      vii.    Notwithstanding any other provision of this Section 1.29, any items that are specially allocated pursuant to Section 9 hereof shall not be taken into account in computing Net Profits or Net Losses.  The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 9 hereof shall be determined by applying rules analogous to those set forth in this definition of Net Profits or Net Losses.

**1.33**    "**New Securities**" shall mean any Membership Interests of the Company, whether now authorized or not, and rights, options or warrants to purchase such Membership Interests, and securities of any type whatsoever that are, or may become, convertible or exchangeable into such Interests; provided, however, that the term "New Securities" does not include: (a) Membership Interests issued or issuable upon conversion of the Membership Interests; (b) Membership Interests issuable upon exercise of any options, warrants or rights to purchase any securities of the Company outstanding as of the date of this Agreement and any securities issuable upon the conversion thereof; (c) Membership Interests issued in connection with any Membership Interest split or recapitalization; (d) Membership Interests (or options, warrants or rights therefor) granted or issued hereafter to employees, officers, directors, contractors, consultants or advisers to, the Company or any subsidiary of the Company pursuant to incentive agreements, profit participation interests, unit purchase or option plans, bonuses or awards, warrants, contracts or other arrangements that are approved by the Board of Managers; (e) any other Membership Interests (and/or options or warrants therefor) issued or issuable primarily for other than equity financing purposes and approved by the Board of Managers; and (f) Membership Interests issued or issuable by the Company to the public pursuant to a public offering of securities.

**1.34**    "**Nonrecourse Debt**" shall have the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

**1.35**    "**Offer**" shall have the meaning given in Section 10.4(a).

**1.36**    "**Operating Year**" shall mean each calendar year, or portion thereof, as applicable.

**1.37**    "**Person**" shall mean any natural person, firm, corporation, general partnership, limited partnership, limited liability company, association, company, trust, estate, custodian, nominee, joint venture, foreign business organization or other individual or entity.

**1.38**    "**Portfolio Company**" shall mean each of Greener Days LLC, a Pennsylvania limited liability company, and Choice Essential Oils, LLC, a Nevada limited liability company, Greenerways Outdoor LLC, a Pennsylvania limited liability company, and any other Person that is, directly or indirectly, Controlled by the Company. For purposes of this definition, the term "**control**" (including "**controlling**" and "**controlled**") shall mean the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of a Person, whether through the ownership of voting interests, by contract, or otherwise.

**1.39**    "**Preferred Units**" shall mean the units of Membership Interests in the Company designated as Preferred Units on Schedule A hereto with the rights and restrictions set forth in this Agreement.

**1.40**    "**Presumed Tax Liability**" shall mean, for any Member during any fiscal year of the Company, an amount equal to the product of (a) the amount of taxable income (including any tax items required to be separately stated under Section 703) allocated to such Member pursuant to this Agreement, and (b) the highest state and federal blended income tax rate applicable to any Member (or, in the case of a Member which is a flow through entity, any owner of such Member) as determined by the Board (without reference to minimum taxes, alternative minimum taxes, or income tax surcharges).  For the avoidance of doubt, the aforesaid highest rate applicable to any Member, once determined, will be applied to each Member regardless of such Member's actual highest state and federal blended income tax rate.

**1.41**    "**Profit (Losses) from Operation**" shall mean the profits (losses) from the operation of the Company, exclusive of gains and losses resulting from a Sale of Assets.

5

**1.42** "**Profits Interest Members**" shall mean the Members holding Profits Interest Units.

**1.43** "**Profits Interest Units**" shall mean the units of Membership Interests in the Company designated as Units representing a profits interest in the applicable holder's Unit Award Agreement, with the rights and restrictions set forth in this Agreement and any applicable purchase agreement, including the holder's Unit Award Agreement.

**1.44** "**Regulations**" shall mean the final, temporary, or proposed Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**1.45** "**Sale of a Portfolio Company**" shall mean a sale of all or substantially all the assets or the ownership interests of a Portfolio Company or merger of a Portfolio Company into or consolidation with any other entity (other than a wholly-owned subsidiary of a Portfolio Company) or any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of a Portfolio Company is disposed of.

**1.46** "**Sale of Assets**" a sale of all or substantially all of the assets of the Company

**1.47** "**Selling Member**" shall have the meaning given in Section 10.1.

**1.48** "**Stock Sale**" means a transaction or series of related transactions in which a Person, or a group of related Persons, acquires from the Members Membership Interests representing more than fifty percent (50%) of the outstanding voting power of the Company.

**1.49** "**Transfer**" shall mean with respect to any Unit in the Company any sale, assignment, hypothecation, mortgage, pledge, encumbrance or other transfer or disposition whether for value or no value and whether voluntary or involuntary (including, without limitation, by merger or operation of law), or an agreement to do any of the foregoing, and with regard to any Person that is a corporation, partnership, trust or other entity, shall include any dissolution, merger, consolidation or other reorganization of such Person, or any other transfer of any interest in such Person (i.e., a transfer of such interests in such a Person shall be deemed to be an indirect transfer of the Company Units held by such Person). "Transferred" shall have a correlative meaning.

**1.50** "**Valuation Date**" shall mean the last day of the month ending coincident with the date (a) on which the Company or the Members have actual knowledge of the Transfer or proposed Transfer, in the case of a purchase and sale under Section 10.2 of this Agreement, (b) of the Member's death, in the case of a purchase and sale under Section 10.3 of this Agreement, or (c) on which the Company or the Members have actual knowledge of a legal proceeding involving a Member, in the case of a purchase and sale under Section 10.4 of this Agreement.

<div align="center">

**SECTION 2**
**ORGANIZATION**

</div>

**2.1** **Organization.** On the Effective Date, the Members organized a Pennsylvania limited liability company by executing and delivering the Certificate of Organization to the Department of State of the Commonwealth of Pennsylvania in accordance with the Act. The Company shall conduct business as a limited liability company pursuant to the terms of this Agreement and the Act.

**2.2** **Name.** The Company shall be known as, and the business and affairs of the Company shall be conducted under the name, "Beacon Organics, LLC" and such name (or such other name(s) as the

Company may adopt through the filing of an amendment to the Certificate of Organization of the Company) shall be used at all times in connection with the business and affairs of the Company.

**2.3    Office.**  The Company's principal place of business shall be determined by the Board. Initially, the Company's principal place of business shall be 668 Stony Hill Road, Suite 143, Yardley, PA 19067.

<div align="center">

**SECTION 3**
**BUSINESS OF COMPANY**

</div>

**3.1    Purpose.**  The purpose of the Company shall be: (a) to accomplish any lawful business whatsoever, which shall at any time appear conducive or expedient for the protection or benefit of the Company and its assets; (b) to exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by a limited liability company under the Act; and (c) to engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

**3.2    Title of Property.**  All tangible and intangible, real and personal property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in such property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. Each Member hereby expressly waives the right to require the partition of any Company property or any part thereof.

**3.3    Term.**  The term of the existence of the Company shall commence on the Effective Date and shall continue until the winding up and liquidation of the Company in accordance with Section 11.1.

<div align="center">

**SECTION 4**
**CAPITAL CONTRIBUTIONS; CAPITAL STRUCTURE**

</div>

**4.1    Capital Contributions.**  Each Member's has made an initial Capital Contribution in exchange for the number of Membership Interests held by each Member of the Company reflected on Schedule A.

**4.2    Membership Interests; Voting**.

(a)    Authorized Units. As of the Effective Date, the Company is authorized to issue an unlimited number of, Preferred Units, A Units, and B Units, and an unlimited number of Profits Interest Units. The Preferred Units, A Units, B Units, and Profits Interest Units shall have the respective rights, preferences and privileges as are set forth in this Section 4.

(b)    Preferred Units. The rights, preferences and privileges of the holders of the Preferred Units shall be as follows:

(1)    For each Preferred Unit held, the holder thereof will be entitled to one (1) vote on any matter to be decided by, or that may be submitted to a vote of, the Members.

(c)    A Units. The rights, preferences and privileges of the holders of the A Units shall be as follows:

(1)    For each A Unit held, the holder thereof will be entitled to one (1) vote on any matter to be decided by, or that may be submitted to a vote of, the Members.

<div align="center">7</div>

(2)    Other than as set forth above with respect to voting, the A Units, and the holders thereof, shall have equal rights, preferences and privileges as are granted herein and/or under the Act to the B Units, and the holders thereof.

(d)    <u>B Units</u>. The rights, preferences and privileges of the holders of the B Units shall be as follows:

(1)    B Units shall not entitle the holders thereof to, and Members solely holding B Units shall not have the right to, vote on any matter to be decided by, or that may be submitted to a vote of, the Members.

(2)    Other than as set forth above with respect to voting, the B Units, and the holders thereof, shall have equal rights, preferences and privileges as are granted herein and/or under the Act to the A Units, and the holders thereof.

(e)    <u>Profits Interests Units</u>. Profits Interest Units shall not entitle the holders thereof to, and Members solely holding Profits Interest Units shall not have the right to, vote on any matter to be decided by, or that may be submitted to a vote of, the Members.

**4.3    Profits Interest Units**.

(a)    Following the approval of the Board, the Company may issue Profits Interest Units up to the maximum number of Profits Interest Units authorized herein and admit persons as Profits Interest Members of the Company in exchange for such contributions to capital or such other consideration (including past or future services) and on such terms and conditions as the Board deems appropriate. The Profits Interest Units are intended to constitute "profits interests," as such term is used by Rev. Proc. 93-27 and Rev. Proc. 2001-43 and are intended to be nontaxable to their recipients to the fullest extent permitted by law, although neither the Members nor the Company makes any representation as to the tax consequences of the issuance of Profits Interest Units pursuant to this Agreement. The recipient of any Profits Interest Unit shall not be entitled to receive distributions from the Company, other than current distributions of Cash Flow pursuant to <u>Section 8.1</u>, until such time as the other Members have received distributions equal to the Distribution Threshold pursuant to <u>Section 11.4</u>. The Distribution Threshold applicable to any Profits Interest Units shall be entered in the holder's Unit Award Agreement by the Board promptly after issuance of such Profits Interest Units. The Board shall have the authority to change the Distribution Threshold following a change in the capital structure of the Company, such as a redemption of a Membership Interest.

(b)    The grant of Profits Interest Units shall be set forth in a Unit Award Agreement which shall set forth (1) the Distribution Threshold; (2) any restrictions upon the Transfer of the Profits Interest Units beyond those set forth in this Agreement; (3) if applicable, the vesting schedule of the Profits Interest Units; and (4) any other provisions determined by the Board.

**4.4    Additional Capital Contributions.**  The Members shall not be required to make Capital Contributions to the Company in excess of their initial Capital Contributions.

**4.5    No Interest.**  The Members shall not receive interest on any Capital Contributions at any time made to the Company or on the balance of their respective Capital Accounts. The preceding sentence shall not modify or effect in any way the terms of <u>Section 8</u>.

**4.6    Return of Capital Contributions.**  No Member shall have the right to demand or to receive the return of his Capital Contribution, except as described in <u>Sections 8.2</u> and <u>8.3</u> hereof.

8

**4.7    Preemptive Rights**.    The Members holding Preferred Units have the right of first refusal to purchase any or all New Securities that the Company may from time to time issue in addition to the Membership Interests outstanding as of the date hereof.    In the event that the Company proposes to undertake an issuance of New Securities, it shall give to the Members holding Preferred Units written notice of its intention to issue New Securities, describing the type of New Securities and the price and the general terms upon which the Company proposes to issue such New Securities given in accordance with Section 12.1.    The Members holding Preferred Units shall have fifteen (15) days from the date such notice is effective, as determined pursuant to Section 12.1 based upon the manner or method of notice, to agree in writing to subscribe for and purchase any or all of such New Securities for the price and upon the general terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased; provided that each Member holding Preferred Units may only purchase up to that number of New Securities in proportion to such Member's respective Preferred Units. In the event that a Member holding Preferred Units fails to exercise in full the foregoing right of first refusal within such fifteen (15) day period, the Company shall have one hundred twenty (120) days thereafter to sell the New Securities with respect to which such right of first refusal was not exercised, at a price and upon general terms not materially more favorable to the purchasers thereof than specified in the Company's notice to the Members holding Preferred Units.    In the event that the Company has not issued and sold the New Securities within such one hundred twenty (120) day period, then the Company shall not thereafter issue or sell any New Securities without again first offering such New Securities to the Members holding Preferred Units pursuant to this Section 4.7.

## SECTION 5
## RIGHTS AND DUTIES OF THE BOARD OF MANAGERS; OFFICERS

**5.1    Board of Managers.**    Except to the extent otherwise provided herein, including without limitation, Section 6.8, the powers of the Company, including, without limitation, entering into such agreements and commitments on behalf of the Company as are desirable from time to time in furtherance of the Company's purposes, shall be exercised by and under the exclusive authority of, and the business and affairs of the Company shall be exclusively managed under the direction of the Board of Managers for the benefit of the Members.    Initially, the members of the Board of Managers shall be Charles Crookenden, Jayme Neiburg, and Andrew Levine. Charles Crookenden is designated as the "tax matters partner" (as defined in Code Section 6231) as in effect for taxable years beginning before December 31, 2017, and as the "partnership representative" (as defined in Code Section 6223) as in effect for taxable years beginning after December 31, 2017 (such Member serving as the "tax matters partner" or "partnership representative, as applicable, the "**Company Representative**"). The Company Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Code or Regulations. The Company Representative shall be reimbursed by the Company for all expenses incurred in connection with all examinations of the Company's affairs by tax authorities, including resulting Proceedings, and is authorized to expend Company funds for professional services and costs associated therewith**.** The Company Representative shall represent the Company in connection with all examinations of the Company's tax returns by tax authorities, including administrative and judicial proceedings to contest any proposed adjustments. Furthermore, the Company Representative shall have the right, power and authority to make any elections and conduct any administrative and judicial proceedings involving the Company under the Partnership Audit Provisions. The Company Representative shall notify the other Members of any audit or other matters of which he or she, in such capacity, is notified or becomes aware.    All elections permitted to be made by the Company under federal and/or state laws shall be made by the Board.

**5.2    Authority and Duty**.    Except as otherwise provided by resolution adopted by the Board, the Board may act only collectively as a board and by resolution duly adopted.    Individual members of the

9

Board shall have only such authority and perform such duties as the Board may, from time to time, delegate to them.

**5.3**    **Number and Election of Members of the Board; Vacancies**.  Subject to Section 6.8 below, the number of members of the Board shall be determined by a Majority Vote; provided that at all times the number of members on the Board shall not less than three (3).

(a)    The holders of record of the Preferred Units, exclusively and as a separate class, shall be entitled to elect one (1) member of the Board (the "**Preferred Manager**"), and the holders of record of the A Units, exclusively and as a separate class, shall be entitled to elect the balance of the members of the Board; provided that if at any time as a consequence of either the indemnification provisions of that certain Unit Purchase Agreement between the Company and the Preferred Holder dated May 15 , 2017 or Section 11.3, the holders of record of the Preferred Units own more than fifty (50%) percent of the Membership Interests, then the Preferred Manager shall be deemed to have three (3) votes on all matters that come before the Board effective immediately following the date on which the holders of record of the Preferred Units own more than fifty (50%) percent of the Membership Interests. Any member elected as provided in the preceding sentence may be removed with or without cause by, and only by, the affirmative vote of the holders of the class of Units entitled to elect such member.  Each member shall be elected (or removed) by the affirmative vote of the holders of record of a majority of the particular class of Units entitled to elect such member, voting exclusively and as a separate class. There shall be no cumulative voting. If the holders of the Preferred Units or the A Units, as the case may be, fail to elect a sufficient number of members to fill all member positions for which they are entitled to elect members, voting exclusively and as a separate class, pursuant to the first sentence of this Subsection 5.3(a), then any member position not so filled shall remain vacant until such time as the holders of the Preferred Units or the A Units, as the case may be, elect a person to fill such member position; and no such member position may be filled by the Members of the Company other than by the Members of the Company that are entitled to elect a person to fill such member position. At any meeting held for the purpose of electing a member of the Board, the presence in person or by proxy of the holders of a majority of the class of Units entitled to elect such member shall constitute a quorum for the purpose of electing such Manager.

(b)    A vacancy on the Board shall be deemed to exist, and a member of the Board shall automatically and without any further action be deemed to no longer be a Manager of the Board upon such member's death, resignation or removal.  A vacancy shall also be deemed to exist if the authorized number of Manager of the Board is increased.

(c)    A Manager of the Board may resign at any time by giving written notice to the Members.  The resignation of a Manager of the Board shall take effect upon receipt of that notice or at such later time as shall be specified in the notice and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  Except as otherwise provided herein, the resignation of a member of the Board shall not affect that member of the Board's rights as a Member and shall not constitute a withdrawal of such Member from the Company.

**5.4**    **Regular Meetings**.  A regular meeting of the Board for the purpose of electing the officers of the Company (if any) and transacting such other business as may come before the meeting shall be held at such time and place, but not less frequently than annually, as determined by the Board. Written notice for any such meeting shall state the place, date and hour of the meeting and shall be delivered either personally, by first class mail, facsimile or other electronic transmission.

**5.5**    **Special Meetings**.  Special meetings of the Board may only be called at the request in writing by any member of the Board.  Written notice for any such meeting shall state the place, date and

10

hour of the meeting and shall be delivered either personally, by first class mail, facsimile or other electronic transmission.

**5.6** **Place of Meeting; Waiver of Notice**.  Meetings of the Board shall be held at such place as shall be designated in the notice of meeting if notice is required.  Notice of any meeting, if required, need not be given to any member of the Board who signs a waiver of notice before or after the meeting.  The attendance of any member of the Board at any meeting without protesting prior to the conclusion of such meeting the lack of notice thereof shall constitute a waiver of notice by such member of the Board .

**5.7** **Quorum**.  The presence in person or by proxy of: (i) not less than half of the members of the Board; and (ii) the Preferred Manager (whose presence shall count towards the computation of whether half of the members of the Board are present) shall constitute a quorum for the purpose of the transaction of business at any meeting of the Board.

**5.8** **Manner of Acting**.  A majority vote of the members of the Board present at a meeting which a quorum is present shall be the act of the Board.

**5.9** **Action Without a Meeting**.  Any action required or permitted to be taken by the Board may be taken without a meeting if, prior to such action, all of the members of the Board consent in writing to a resolution authorizing the action.  In the case of a single-member Board the written consent of that single member shall be sufficient to authorize such action without a meeting.  Such written consents may be executed in counterparts, and shall be filed with the minutes of the Company.

**5.10** **Telephonic Attendance at Meeting**.  Any or all members of the Board may participate in a meeting of the Board by means of conference telephone or any means of communication by which all persons participating in the meeting are able to hear each other.

**5.11** **Specific Actions**. Without limiting the generality of <u>Section 5.1</u>, but at all times subject to <u>Section 6.8</u>, the Board shall have the power and authority to the fullest extent permitted by the Act, on behalf of the Company, among other things, to:

(a)    acquire property in the ordinary course of business from any person (including Members or affiliates of any thereof);

(b)    purchase liability and other insurance to protect the property and business of the Company, or as may be required by the Members or any lender to the Company;

(c)    employ, terminate employment of, and otherwise fix the terms of employment and termination of employment of, employees of Company (including Members or affiliates of Members);

(d)    invest Company funds in time deposits, short-term governmental obligations, commercial paper or other similar investments or in any other capital asset or investment in the ordinary course of business;

(e)    make decisions concerning the distribution of Cash Flow to the Members in accordance with <u>Section 8.2</u> hereof;

(f)    execute on behalf of the Company instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, leases (and alterations, modifications or terminations thereof), partnership agreements, and any other instruments or documents necessary, in the

44924252.v12

opinion of the Board, to the business of the Company and relating to transactions that have been approved in accordance with this Agreement;

(g)     borrow money for the Company in the ordinary course of business, on a secured or unsecured basis, from banks or any other person (including Members or affiliates of any thereof);

(h)     enter into any and all other agreements on behalf of the Company with any other person (including Members or affiliates of any thereof), for any purpose in the ordinary course of business, in such forms as the Board may approve;

(i)     institute, prosecute, defend and settle legal, administrative or other suits, claims or proceedings against or by the Company or in the Company's name and engage counsel in connection with any such suit, claim or proceeding;

(j)     purchase, construct or otherwise acquire real property, or acquire any equity interest therein;

(k)     change the principal business of the Company, enter new lines of business, or exit the current line of business;

(l)     enter into any corporate strategic relationship involving the payment contribution or assignment by the Company or to the Company of assets outside the ordinary course of business;

(m)     guarantee any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(n)     enter into an acquisition, merger or purchase agreement with any third party; and

(o)     do and perform any and all other lawful acts as may be necessary or appropriate to conduct the business of the Company.

**5.12     Reimbursement and Compensation of Members of the Board**.  All reasonable direct costs and expenses incurred by a member of the Board in conducting the business and affairs of the Company shall be reimbursed by the Company as a Company expense.  A member of the Board shall be entitled to receive an increase in compensation for his or her services in such capacity (and not as distributions in respect of his or her Units) as determined from time to time by a Majority Vote. Compensation to any Board member shall be paid only to the extent of Cash Flow and only after provision has been made for Tax Distributions pursuant to Section 8.1.  Any compensation paid to Members of the Board shall be treated as "guaranteed payments" with the meaning of the Code.

**5.13     Exculpation and Indemnification of Board.**

(a)     **Exculpation; Indemnification; Advancement of Expenses**. Each member of the Board (each, an "**Indemnitee**") shall, to the fullest extent permitted or required by the Act or other applicable law, be exculpated from, and indemnified by, the Company against any liability, loss, damage, penalty, action, claim, judgment, settlement, cost or expense of any kind or nature whatsoever (including all reasonable attorneys' fees, costs and expenses of defense, appeal and settlement of any proceedings instituted against such Indemnitee or the Company and all costs of investigation in connection therewith) that in any way relates to or arises out of, or is alleged to relate to or arise out of, any action or inaction on the part of the Company or such Indemnitee acting on behalf of the Company, except to the extent attributable to such Indemnitee's own recklessness, knowing violation of law, or willful misconduct. The

12

Company may advance expenses incurred by such Indemnitee upon the receipt by the Company of the signed statement of such Indemnitee agreeing to reimburse the Company for such advance in the event it is ultimately determined that such Indemnitee is not entitled to be indemnified by the Company for such expenses. The Members agree that the terms and provisions of this Section 5.13(a) are not manifestly unreasonable.

(b)    **Exculpation of Indemnitees.** To the fullest extent permitted by the Act, no Indemnitee shall be liable to the Company or its Members for monetary damages for an act or omission in such person's capacity as a member of the Board. If the Act is amended to authorize further elimination of or limitations on the liability of persons serving in the capacity as Indemnitees, then the liability of each such Indemnitee shall be eliminated or limited to the fullest extent permitted by the Act as so amended. Any repeal or modification of this Section 5.13(b) shall not adversely affect the right or protection of such Indemnitee existing at the time of such repeal or modification. The Members agree that the terms and provisions of this Section 5.13(b) are not manifestly unreasonable.

**5.14    Other Activities**.  Except as otherwise provided by Section 6.9, this Agreement shall not preclude or limit, in any respect, the right of any member of the Board or any of his or her affiliates to engage or invest, directly or indirectly, in any business activity or venture of any nature or description. Neither the Company nor any member of the Board shall have any right to participate in any investments made by, or other activities of any member of the Board by virtue of his or her position on the Board.

**5.15    Committees**.  The Board may establish one or more committees including but not limited to, a compensation committee, each committee to consist of one or more members of the Board, and shall delegate such powers and authority in the management of the business and affairs of the Company as shall be designated by the members of the Board; provided that the Preferred Manager shall be invited to sit on each such committee.

**5.16    Officers.** The Board may appoint individuals as officers of the Company (the "**Officers**") as the Board deems necessary or desirable to carry on the business of the Company and the Board may delegate to such Officers such power and authority as the Board deems advisable subject to the limitations of Section 6.8. No Officer need be a Member of the Company. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his or her successor is designated by the Board or until his or her earlier death, resignation, or removal. Any Officer may resign at any time on written notice to the Board. Any Officer may be removed by the Board with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal, or otherwise, may, but need not, be filled by the Board. Officers shall be entitled to reimbursement, exculpation, and indemnification to the same extent as the members of the Board as set forth herein.

**5.17    Portfolio Companies**.  The Company intends that each Portfolio Company remained wholly-owned by the Company unless the Board of Managers, subject to Section 6.8, determines otherwise. Accordingly, each limited liability company agreement of a Portfolio Company shall provide that the Company as the sole member of the Portfolio Company shall redeem any minority interest in a Portfolio Company that is created by the exercise of any option or similar right existing as of the date hereof in exchange for Class B units of the Company having equal value to the minority interest in issue as determined in accordance with Section 10.5.

### SECTION 6
### RIGHTS AND OBLIGATIONS OF MEMBERS; RESTRICTIVE COVENANTS

**6.1    General.**  Except as specifically provided in writing by the Board, the Members shall not act in the name of or as the representative of the Company and shall not deal with the Company's assets in

any way, and shall not incur any obligation for which the Company or the other Members will or may be liable, and the Members shall not otherwise bind the Company or the other Members, and any violation of this <u>Section 6.1</u> shall be deemed to constitute willful misconduct.

**6.2    Limited Liability.**  Each Member's liability shall be limited as set forth in this Agreement, the Act and other applicable law, as each is amended from time to time.

**6.3    Company Debt Liability.**  Unless otherwise provided for herein, a Member will not be personally liable for any debts or losses of the Company beyond his respective Capital Contribution.

**6.4    Meetings.**  No meetings of the Members need be held.  Meetings of the Members, however, may be called by the affirmative vote or written consent of the members holding not less than twenty (20%) percent of the Units.  Meetings of the Members duly called shall not be organized for the transaction of business unless all Members are present.

**6.5    Other Compensation.**  No Member shall be entitled to any fees, commissions or other compensation from the Company for any services rendered to or performed for the Company unless otherwise agreed to by the Board in writing.

**6.6    Liability of a Member to the Company.**  No Member shall be liable as such for the acts, debts, obligations or liabilities of the Company.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability upon any Member for liabilities of the Company.

**6.7    Company Indemnification.**  To the fullest extent permitted by law and the Act, the Company shall indemnify the Members and Company employees and other agents for, and shall hold the Members and Company employees and other agents harmless from and against, any liability, including without limitation attorney's fees and costs, to any Person arising or incurred in connection with the good faith discharge of the Members' or Company employees' and other agents' obligations under this Agreement.

**6.8    Actions Requiring Approval of Members Holding Preferred Units**. Notwithstanding anything herein to the contrary, without the consent of the Members holding a majority of the Preferred Units, the Company, a Portfolio Company, or the Board, on behalf of the Company or a Portfolio Company, shall not, and shall not enter into any commitment to:

(a)    Amend, modify, or waive any of the provisions of the Certificate of Organization or of this Operating Agreement;

(b)    Issue New Securities of the Company or either of its Portfolio Companies;

(c)    Redeem or buy back any Units;

(d)    Admit persons as new Members of the Company;

(e)    Incur any indebtedness, pledge, or grant liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other person; provided that this limitation shall not apply to the incurrence of trade payables of the Company or of any Portfolio Company arising in the ordinary course of business;

14

(f)        Make any loan or advance to any person;

(g)        Enter into any contract with any vendor or supplier, or any lease for real or personal property, that provides for annual payments in excess of $100,000;

(h)        Many any distributions of funds of the Company other than as set forth herein;

(i)        Enter into any contract of agreement with any of its Affiliates, other than a Portfolio Company;

(j)        increase or decrease the size of the Board of Managers;

(k)        Engage or dismiss accountants or attorneys representing the Company;

(l)        Except to the extent previously approved by the Managers in accordance with this Section, adopt, amend or modify any option plan or employee ownership plan or issue any units to its or its subsidiaries' employees;

(m)        Sell all or substantially all of the assets of the Company or of any Portfolio Company;

(n)        Sell any of the ownership interests of any Portfolio Company;

(o)        Change the principal business or the Company or any of the Portfolio Companies or cause the Company or any of the Portfolio Companies to enter into a new line of business;

(p)        Cause to be franchised the business of the Company or any of the Portfolio Companies;

(q)        Hire, terminate, or change the compensation of any of the Company's or any of the Portfolio Companies' executive officers;

(r)        Acquire another entity or line of business (whether by merger or purchase of assets of equity);

(s)        Approving the Company's annual budget (including all capital expenditures);

(t)        Deviate from the annual budget in excess of five percent (5.0%) with respect to any line item thereon;

(u)        Change the tax status of the Company;

(v)        Recognize or take any action to effect a Transfer of Units by either of Jayme Bella or Sharon Neiburg; or

(w)        Dissolve or liquidate the Company.

**6.9**     **Restrictive Covenants**.

(a)        <u>Noncompetition and Non-solicitation</u>.  Each Member acknowledges that as a result of such Member's ownership of Membership Interests and affiliation with the Company, such Member may possess confidential information concerning the business of the Company, may have significantly and

15

uniquely contributed to the development and maintenance of the goodwill of the Company, and may possess the experience and capabilities to own, manage, operate, control or participate in the ownership, management, operation or control of, a business that, or a business organization a part of which, is similar to the business of the Company.  Therefore, each Member covenants and agrees that so long as a Member is a Member of the Company, and for a period of three (3) years after such Member ceases to be a Member of the Company, such Member agrees that such Member or its Affiliates shall not, directly or indirectly, as an individual, independent contractor, partner, joint venturer, officer, director, shareholder or in any other form or business combination whatsoever engage in any business which competes with the Company in the manufacture, distribution, marketing or sale of essential oils and related products, or any other products being manufactured, distributed, marketed or sold by the Company hereafter anywhere in the world where the Company does business.  Further, each Member covenants and agrees that so long as a Member is a Member of the Company, and for a period of three (3) years after such Member ceases to be a Member of the Company, such Member agrees that such Member or its Affiliates shall not, directly or indirectly: (i) solicit, utilize or usurp any of the business contacts of the Company made through or by any of the Members if such action is reasonably and foreseeably likely to harm the Company or disrupt its operations; (ii) induce or attempt to influence any employee, contractor, agent or representative of the Company to terminate such person's employment, consulting or other relationship with the Company; or (iii) request, advise or suggest to any present or past customer or other business source of the Company to withdraw, curtail or cancel any business with the Company, or otherwise solicit any such past or present customer or other business source of the Company to terminate, reduce or otherwise alter, to the Company's detriment, its relationship with the Company.  In the event of a violation of this Section 6.9, the Company and the Members may seek the remedies set forth in Section 6.9 (c) below in addition to any other remedies allowed by law or by this Agreement, including without limitation the recovery of damages, attorneys' fees and injunctive relief. Notwithstanding the foregoing: (i) this Section 6.9(a) shall not prevent a Member from owning up to five percent (5%) of the stock of any publicly-traded company, whether or not it competes with the Company.

(b)    Confidential Information; Ownership; Non-Disclosure.

(1)    For purposes of this Agreement, "Confidential Information" means all information of the Company (or information of another party which the Company has in its possession) including, but not limited to, information relating to the Company's business, trade secrets, operations and software products, computer source code and object code, hardware and software designs and specifications, schematics, engineering details and reports, flow charts, technology, tax returns, vendor lists, pricing and other product or service information, business plans and related documents, customer information, any technical or non-technical data, formulae, patterns, compilations, programs, devices, intellectual property, methods, techniques, designs, processes, procedures, plans, know-how, improvements, models or manuals of Company or any affiliate, any financial data or lists of actual or potential customers, referral sources or suppliers (including contacts thereat) of Company, and any information regarding Company's contracts, referral sources or marketing and sales plans, which is not generally known to the public.  Member agrees that such Confidential Information is proprietary to Company and shall be deemed to be a "trade secret" regardless of whether such information was or is transmitted orally, in writing, electronically or in whatever other form, or whether such information was or is tangible or intangible or obtained from observation.  Confidential Information shall further include any supplemental information the Company has provided to a Member or provides to such Member in the future, as well as information that has been or is expressly designated by the Company as "Confidential Information."  If the information disclosed was or is oral, then it shall be presumed by the receiving party to be Confidential Information.

(2)    Notwithstanding the foregoing, Confidential Information shall not include any information that (A) was in the public domain at the time of the Company's communications to the receiving Member; (B) entered the public domain through no fault of the receiving Member subsequent to

16

the time of communication to the receiving Member; (C) was already known to the receiving party at the time of disclosure, as evidenced by the receiving Member's prior written records; (D) was disclosed to the receiving Member by a third party who owed no obligation of confidentiality to the Company; or (E) the Company and the receiving Member have agreed in writing may be disclosed.

(3)  All Confidential Information in whatever form is and shall remain the property of the Company.  All Confidential Information shall be returned to the Company promptly upon the written request of the Company, upon the termination of this Agreement, or upon the date the receiving Member no longer owns any Membership Interests.  No Confidential Information shall be retained in any form by the receiving Member and the receiving Member shall destroy all written summaries or synopses of Confidential Information.

(4)  The receiving Member shall not disclose or transmit any Confidential Information to any person or entity other than to Affiliates who have a need to know such information and who have been informed of and agree to abide by the receiving Member's obligations under this Agreement.  Each such Affiliate shall also be informed that by accepting such access, he, she, or it agrees to be bound by the provisions of this Agreement.  Furthermore, by allowing any such access, the receiving Member agrees to be and remain jointly and severally liable for any disclosure by any such Affiliate that is not in accordance with this Agreement.  The receiving Member shall use not less than the same degree of care to avoid disclosure of Confidential Information as the receiving Member uses for its own confidential information of like importance, and at a minimum, shall exercise reasonable care.

(5)  This Agreement does not prohibit the disclosure of Confidential Information where applicable law requires, including, but not limited to, disclosure in response to subpoenas and/or orders of a governmental agency or court of competent jurisdiction and any disclosures necessary to comply with applicable securities laws.  In the event the receiving Member is required to disclose Confidential Information in accordance with the previous sentence, the receiving Member shall immediately, and in no event later than five (5) days prior to such required disclosure, notify the Company in writing, and cooperate with the Company in seeking to limit the disclosure of such Confidential Information in accordance with public law.

(c)  Remedies.  Each party hereto recognizes that a breach of any of the provisions of Section 6.9 would result in serious harm to the Company (or its Affiliates) for which monetary damages would be inadequate, difficult to determine, or both.  Therefore, if any Member or its Affiliates breaches any provision of Section 6.9, the Company (and/or its Affiliates) shall be entitled to seek injunctive relief and specific performance in addition to any other available legal or equitable remedies against such breaching Member and/or its Affiliates (as applicable), and shall not be required to post any bond or other security in connection therewith.  In addition, the Company shall be entitled to offset any payments and/or distributions otherwise payable by the Company pursuant to any provision of this Agreement or otherwise by the amount of any damages suffered by the Company as a result of such breach and withhold any net amount payable to such Member until such time as such Member is no longer in violation of any of the provisions of Section 6.9 (and no interest shall accrue during the time such amount is withheld).  The remedies provided in this Section 6.9(c) shall be deemed cumulative and the exercise of one shall not preclude the exercise of any other remedy at law or in equity for the same event or any other event.

## SECTION 7
## ACCOUNTING AND TAX MATTERS

7.1  **Fiscal Year.**  The fiscal year of the Company shall be the calendar year.

17

**7.2      Accounting Method.**  The books and records of the Company shall be maintained on the method of accounting chosen by the Board and otherwise in accordance with generally accepted accounting principles consistently applied and shall show all items of income and expense.

**7.3      Records and Reports.**  Each Member and his respective attorneys, accountants and other advisors, shall have the right at all times during usual business hours and upon reasonable notice, to examine, review and make copies of the books and records of the Company for a legitimate purpose related to their ownership of the Company. In addition, the Board may redact any schedule to this Agreement that discloses the names of Members or the Capital Contributions or other information with respect thereto if the Board determines such action to be necessary. Each Member shall maintain all information relating to the Company contained in such reports and books and records in strict confidence.  Each Member making such examination, review or copying shall bear all of the expenses incurred by such Member and the Company in any such examination, review and copying.

**7.4      Tax Status.**  Each Member hereby recognizes that the Company will be recognized as a partnership for federal income tax and Pennsylvania tax purposes and will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code.  Each Member shall use all reasonable efforts to cause the Company's accountants to prepare and make timely filings of all tax returns and statements which the Company's accountants determine must be filed on behalf of the Company with any taxing authority or jurisdiction in which the Company does business.  No Manager or Member shall file or execute any document that causes the Company to be taxed as type of entity other than a partnership for federal income tax and Pennsylvania tax purposes without the express written consent of all of the Members.

**7.5      Capital Accounts.**

(a)      A separate Capital Account shall be established and maintained for each Member in accordance with the Treasury Regulations § 1.704-1(b)(2)(iv).  Accordingly, each Member's Capital Account shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such Contributed Property that the Company is considered to assume or take subject to under Code §752), and (iii) allocations to such Member of Profits; and shall be decreased by (A) the amount of money distributed to such Member by the Company, (B) the fair market value of the property distributed to such Member by the Company, and (C) allocations to such Member of Losses and deductions as set forth in the Code and the regulations thereto.

(b)      The manner in which the Capital Accounts are to be maintained pursuant to this Section 7.5 is intended to comply with the requirements of Code Section 704(b) and the regulations promulgated thereunder.

(c)      Upon an Event of Dissolution, liquidating distributions will be made as described in Section 11.4.  The Company may offset damages for breach of this Agreement by a Member (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

**7.6      Payment of Expenses.**  At all times prior to the termination or dissolution of the Company, the cash proceeds of the Company, together with any net reduction in the reserves of the Company, shall be applied first to the payment of all taxes, debts and other obligations and liabilities of the Company which are then due and owing, and the establishment of reasonable reserves for contingent and future liabilities and distributions of the Company, as determined by the Board.

44924252.v12

**7.7     Loans to Company.**  Nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

## SECTION 8
## DISTRIBUTIONS

**8.1     Tax Distribution**.  For each fiscal year of the Company, the Company shall, not later than ninety (90) days following the end of such fiscal year, distribute to each Member an amount of cash equal to such Member's Presumed Tax Liability for such fiscal year. Any amount distributed pursuant to this Section 8.1 will be deemed to be an advance distribution of amounts otherwise distributable to the Members pursuant to Section 8.2 and will reduce the amounts that would subsequently otherwise be distributable to the Members pursuant to Section 8.2 in the order set forth in Section 8.2. All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld and shall be treated as a tax distribution for the purpose of this Section 8.1. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

**8.2     Cash Flow.**  Cash Flow, if any, remaining after the distributions under Section 8.1, shall be determined for each Operating Year, and shall, at such time(s) as the Board shall determine, be distributed to the Members pro rata in proportion to their respective Membership Interests.:

**8.3     Distributions of Capital Proceeds.**  Distributions of Capital Proceeds shall be made in accordance with Section 11.4 hereof.

**8.4     Limitation Upon Distributions.**  Notwithstanding anything to the contrary contained in this Section 8, the Company shall not make a distribution to any Person on account of his Units  (i) in violation of the Act, or (ii) if such distribution would be in violation of or inconsistent with any loan documents relating to any indebtedness of the Company.

## SECTION 9
## ALLOCATIONS

**9.1**     Net Profits and Net Losses shall be determined and allocated to the Capital Accounts of the Members with respect to each fiscal year of the Company as of the end of such fiscal year. Subject to the other provisions of this Agreement, an allocation to a Member of a share of Net Profits or Net Losses shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profits or Net Losses.

**9.2**     Subject to Section 9.4 *et seq.*, Net Profits and Net Losses for each fiscal year shall be allocated to the Members in amounts that would result in Capital Account balances for each Member to equal the amount required to be distributed pursuant to Section 11.4 to such Member in accordance with the priority and manner provided therein on a hypothetical liquidation of the Company.  In determining the amounts distributable to the Members under Section 11.4 upon a hypothetical liquidation, it shall be presumed that (i) all of the Company's remaining assets are sold at their respective values reflected on the books of account of the Company, determined in accordance with Section 704(b) of the Code and the Treasury Regulations thereunder ("**Book Value**"), without further adjustment, (ii) payments to any holder of a nonrecourse debt are limited to the Book Value of the assets securing repayment of such debt, (iii) all

Units are vested, and (iv) the proceeds of such hypothetical sale are applied and distributed in accordance with Section 11.4

**9.3**     The parties intend that the allocation provisions of this Section 9 shall produce Capital Account balances of the Members that will be consistent with the distribution provisions of Section 11.4. Notwithstanding anything to the contrary in this Agreement, to the extent the Managers determine that the allocation provisions of this Section may fail to produce such Capital Account balances, (i) such provisions shall be amended by the Managers to the extent necessary to produce such result and (ii) Net Profits and Net Losses and other items of income, gain, loss, credit and deduction of the Company for the most recent open year (or items of income, gain, loss, deduction, and Code Section 705(a)(2)(B) expenditures of the Company for such years) shall be reallocated among the Members to the extent it is not possible to achieve such results with allocations of Net Profits and Net Losses (or items of income, gain, loss, deduction, and Code Section 705(a)(2)(B) expenditures) for the current year and future years, as determined by the Manager, subject to any requirements of the Code and the Treasury Regulations.

**9.4**     **Deductions Attributable to Member Nonrecourse Debt.**  Notwithstanding anything contained herein to the contrary, all deductions which are attributable to Member Nonrecourse Debt (as defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated in accordance with the provisions of Section 1.704-2(i) of the Regulations.

**9.5**     **Qualified Income Offset.**  Notwithstanding any other provision hereof, if any Member receives an unexpected adjustment to his Capital Account, an unexpected allocation of loss or deduction or an unexpected distribution as described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, as they now exist or may be amended, which creates or increases a deficit balance in his Capital Account in excess of such Member's Loss Limit (as defined in Section 9.9 hereof), such Member shall be allocated items of income and gain consisting of a pro-rata portion of each item in an amount and manner sufficient to eliminate such increase in such Member's deficit balance as quickly as possible.  This provision is intended as a "qualified income offset" as defined in Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

**9.6**     **Minimum Gain Chargeback.**  Notwithstanding any other provision hereof, if there is a net decrease in Company Minimum Gain during a Company taxable year, each Member shall be allocated items of income and gain for such year (and, if necessary, for subsequent years), equal to such Member's share of the net decrease in Company Minimum Gain within the meaning of Section 1.704-2(g)(2) of the Regulations.  This provision is intended as a "minimum gain chargeback" as described in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

**9.7**     **Member Minimum Gain Chargeback.**  Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to that Member's share of the net decrease in the Member Minimum Gain attributable to such Member Nonrecourse Debt to the extent and in the manner required by Section 1.704-2(i) of the Regulations.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and (j)(2) of the Regulations.  This Section 9.7 is intended to comply with the minimum gain chargeback requirement with respect to Member Nonrecourse Debt contained in said section of the Regulations and shall be interpreted consistently therewith.  Allocations pursuant to this Section 9.7 shall be made in proportion to the respective amounts required to be allocated to each Member pursuant hereto.

20

**9.8    Tax Allocations: Code Section 704(c).**  Except as otherwise provided herein, allocations of profits, gains and losses for tax purposes shall be made in the same manner as the allocations for book purposes described in Sections 9.1 and 9.2 of this Agreement.  However, in accordance with Code Section 704(c) and the Regulations thereunder, items of income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted tax basis of the property and its fair market value at the time the property was contributed to the Company.  Such allocation shall be made in accordance with the "traditional method" described by Section 1.704-3(b) of the Regulations.  Upon a Sale of a Portfolio Company, any gain or loss in excess of the amount allocated under Code Section 704(c) shall be allocated for tax purposes among the Members in accordance with the provisions of Section 9.2 hereof.  Allocations pursuant to this Section 9.8 are solely for purposes of Federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of profits, losses, or distributions pursuant to any other provision of this Agreement.

**9.9    Loss Limit.**  Notwithstanding anything contained herein to the contrary, loss (or any item thereof) which, if allocated to a Member, could result in his having a deficit balance in his Capital Account shall be allocated to such Member if and only to the extent that such deficit balance does not exceed the sum of (a) the remaining amount that such Member is, or is treated as, obligated to contribute to the Company, plus (b) the amount, if any, of the deficit Capital Account which the Member is obligated to restore, plus (c) such Member's shares of Company Minimum Gain and Member Minimum Gain.  The maximum deficit balance in a Member's Capital Account, as calculated in accordance with the preceding sentence, is referred to elsewhere herein as the "Loss Limit."  For this purpose, a Member's Capital Account shall be adjusted for (A) allocations of loss or deduction that, as of the end of the Company taxable year, reasonably are expected to be made to such Member's Capital Account pursuant to Section 704(e)(2) or Section 706(d) of the Code or pursuant to Section 1.751-1(b)(2)(ii) of the Regulations, and (B) distributions that, as of the end of such year, reasonably are expected to be made to such Member to the extent they exceed offsetting increases to such Member's Capital Account that reasonably are expected to occur during (or prior to) the years in which such distributions reasonably are expected to be made; and otherwise in accordance with Section 1.704-1(b)(2) of the Regulations.

## SECTION 10
## TRANSFERS OF MEMBERSHIP INTERESTS

**10.1    Restrictions on Transfers**.

(a)    Except as may be otherwise provided in this Agreement, no Member (or assignee or transferee of a Member's Units), directly or indirectly, shall Transfer such Member's Membership Interests, or any portion thereof, to another Person who is not already a Member without the prior written consent of a majority of the disinterested Managers on the Board.  Any assignee or transferee of any Membership Interests transferred in contravention of this Agreement shall have no right to participate in the management of the business and affairs of the Company or to become a Member and any voting rights attributable to such Membership Interests shall not be counted for any purposes whatsoever.  Such assignee or transferee shall only be entitled to receive such benefits as are specifically provided by law.

(b)    Notwithstanding anything herein to the contrary, no Member shall have the right to Transfer such Member's Membership Interests if such Transfer would result, directly or indirectly, in (i) the termination of the Company as a partnership for state law or federal or state tax purposes; (ii) the violation of any applicable law, including, without limitation, the 1933 Act and any rules or regulations thereunder or any applicable state securities laws or any rules or regulations thereunder; (iii) the violation of any investment representation given by such Member in connection with such Member's acquisition of Membership Interests; or (iv) the violation of the terms of this Agreement.

21

**10.2    Right of First Refusal**.

(a)    Except with respect to a Transfer of Membership Interests in accordance with Section 10.10, in the event a Member has received prior written consent of the disinterested Managers as required by Section 10.1 and such Member ("**Selling Member**") receives a bona fide written offer ("**Offer**") to Transfer any of his, her, or its Membership Interest to a Person who is not already a Member that the Selling Member desires to accept, the Selling Member shall be obligated first to offer in writing to sell his, her, or its Membership Interest to the Company for the price and on the terms and conditions as set forth in the Offer.

(b)    The Company shall have thirty (30) days from receipt of such written offer within which to elect to purchase all of such Selling Member's Membership Interests being offered.

(c)    If the Company does not elect to purchase all of such Member's Units within the periods provided in this Section 10.2, the Selling Member shall have thirty (30) days from the expiration of such periods to Transfer the offered Membership Interest to the third party making such Offer; provided, however, that the price and the terms and conditions of such offer cannot be more favorable than contained in the Offer given to such Members and the Company.  Any Membership Interest not so Transferred to such third party in compliance with the terms of this Agreement within said sixty (60) day period shall again be subject to all of the provisions of this Agreement and may not be Transferred except in accordance herewith.

**10.3    Death or Disability of Member**.  Upon the death or Disability of a Member, the Company shall have the option to purchase all Membership Interests owned by such Member at such time. The Company shall have ninety (90) days following the date of such Member's death or Disability within which to exercise the Option.  The purchase price and the method of payment for the Units purchased pursuant to this Section 10.3 shall be determined according to the provisions of Sections 10.5(b) and 10.5(c) of this Agreement.  If a Member is an entity and not an individual, the death of the majority owner of such entity shall be deemed to be a death of such Member for purposes of this Section 10.3.

**10.4    Legal Proceedings Involving Members**.

(a)    Upon the happening of any of the legal proceedings set forth below in Section 10.4(c) involving a Member, the Member, or such Member's legal representative, as the case may be, shall be deemed to have offered for sale, on the date such legal proceeding is initiated, all Membership Interests owned by such Member or such Member's personal representative in accordance with Section 10.4(b).  The purchase price and the method of payment for any Membership Interests purchased pursuant to this Section 10.4 shall be determined according to Sections 10.5 and 10.6 of this Agreement (as modified by Section 10.4(b) below).

(b)    Any Member who is required to Transfer one or more Membership Interests pursuant to Section 10.4(a) shall be deemed to have offered such Membership Interests for sale first to the remaining Members and then to the Company on a secondary basis.  The remaining Members shall have thirty (30) days (commencing on the date of the triggering event specified below in Section 10.4(c)) to elect to purchase any or all Membership Interests owned by such Member. In the event that any of the Members elect not to purchase such Membership Interests, the Members who do so elect to purchase such Membership Interests may elect to purchase such unpurchased Membership Interests. If the remaining Members either fail to exercise their rights under this Section 10.2 or do not purchase all of such Member's Membership Interests within the thirty (30) day period, the Company shall within thirty (30) days immediately following the expiration of the aforementioned thirty (30) day Member option period purchase all (but not less than all) of such Member's unpurchased Membership Interests for one-half (1/2) of the

22

Purchase Price.  The remaining Members, as the case may be, may exercise its or their rights during the option periods set forth in this <u>Section 10.4(b)</u> by giving notice to the deemed offering Member as set forth in <u>Section 12.1</u>.

(c)    <u>Sections 10.4(a)</u> and <u>10.4(b)</u> shall apply if a Member:

(1)    makes an assignment for the benefit of creditors;

(2)    voluntarily initiates any bankruptcy, insolvency, reorganization, arrangement, debt adjustment, liquidation, or receivership proceeding;

(3)    involuntarily has any bankruptcy, insolvency, reorganization, arrangement, debt adjustment, liquidation, or receivership proceeding commenced against such Member which is not dismissed within thirty (30) days of the commencement thereof; or

(4)    has any of such Member's Membership Interests attached or become subject to distribution, or become subject to a charging order (including, without limitation, pursuant to a divorce action); or

(5)    is convicted of, or pleads guilty to or nolo contendere with respect to, a felony involving moral turpitude.

**10.5    Purchase or Redemption Price**.  The purchase price of the subject Membership Interests (the "**Purchase Price**") for the purposes of <u>Sections 10.3</u> and <u>10.4</u> (as may be modified therein) shall be equal to the Fair Market Value of such Membership Interests as of the Valuation Date.  If for the purpose of this <u>Section 10</u>, the Fair Market Value of a Member's Units needs to be determined and within thirty (30) days of the event giving rise to such need the parties are unable to agree on the Fair Market Value of the such Units, then the Fair Market Value shall be determined by Appraisal using the following method:

(a)    Either the Company or the owner of the Units in issue (the "**Seller**") may start the appraisal process by giving written notice to the other party that Fair Market Value is to be determined by Appraisal (the "**Appraisal Notice**").  Each of the Company and the Seller shall appoint an appraiser by giving written notice to the other party of the name of the appraiser so selected within fifteen days following the date of the Appraisal Notice.  Each appraiser so appointed shall have not less than five (5) years business appraisal experience and shall not have previously acted in any capacity for either the Company or the Seller.  If either party fails to appoint their appraiser within said fifteen (15) day period, the Fair Market Value of the Units shall be determined by the sole appraiser appointed.  Each appraiser shall be instructed to complete their appraisals within thirty (30) days of their appointment.  The appraisers shall conduct independent appraisals and meet within thirty (30) days after their appointment.  If the lower of the two appraisals is within 90% of the Fair Market Value of the higher appraisal, the average of the two appraisals shall be the Fair Market Value of the Units.  If the lower of the two appraisals is not within 90% of the Fair Market Value of the higher appraisal, the Appraisers shall meet to mutually agree on the Fair Market Value of the Units.  If the appraisers reach mutual agreement they shall issue a joint appraisal as to the Fair Market Value of the Units.

(b)    If the two selected appraisers are unable to agree as to the Fair Market Value of the Units, they shall jointly appoint a third appraiser who meets the qualifications set forth for appraisers above.  If said appraisers fail to appoint a third appraiser within seven (7) days after such thirty (30) day period, the third appraiser who meets the qualifications set forth for appraisers above shall be appointed by the Company's accountants.  The third appraiser shall be instructed to review the two appraisals, undertake such additional information gathering as may be required and within thirty (30) days of his appointment

23

select the appraisal that he believes is closest to Fair Market Value.  The appraisal so selected shall be the Fair Market Value of the Units and the final purchase price ("**Purchase Price**").  Each party shall pay the cost of the appraiser they select, and if a third appraiser is required, the party whose appraisal is not chosen shall pay the cost of the third appraiser. The determination of the Fair Market Value of the Common Units by a single appraiser or multiple appraisers, as the case may be, in accordance with this Agreement shall be final and binding on all parties and shall not be subject to any further appeal, dispute or adjustment absent manifest error.

(c)    Notwithstanding the foregoing, the Members may at any time fix the agreed value of the Units of the Company by a Certificate of Agreed Value signed by each party to this Agreement and filed with the Company.  If at any time it becomes necessary to determine the value of the Units of the Company and a Certificate of Agreed Value is in existence, and such Certificate of Agreed Value is dated less than twelve (12) months before the date as of which the value is to be determined, then the agreed value set forth in such Certificate shall be conclusive as to value and shall be accepted as the value as of the date on which value is to be determined, and no other determination of value shall be required or made.  In no event shall a Certificate of Agreed Value be effective unless signed by all of the Members.  The parties may at any time execute a new Certificate of Agreed Value that shall automatically replace all prior Certificates of Agreed Value and in no event shall any but the last Certificates of Agreed Value be effective, if at all, for the purpose herein specified.  Any Certificate of Agreed Value dated more than twelve (12) months before the date as of which value is to be determined shall not be conclusive, and shall be null and void and of no further force or effect.

**10.6    Payment Terms**.  The Purchase Price shall be paid as follows: (i) the first twenty-five (25%) percent of the Purchase Price shall be paid in immediately available funds at the closing; and (ii) the remaining Purchase Price shall be paid by the delivery of a promissory note at closing, which promissory note (each, a "**Seller Note**") shall bear interest at the lowest rate allowed by the Code in order to avoid the imputation of interest, and shall be amortized over a five (5) year term with equal payments of principal and interest due quarterly in arrears. Each Seller Note shall provide that (A) the maturity date may be accelerated, in the sole and absolute discretion of the holder, if any payment default continues thereunder for thirty (30) days or more, (B) the maturity date may be accelerated, in the sole and absolute discretion of the holder, upon a Sale of the Company, and (C) that the maker shall pay reasonable attorneys' fees to the holder in the event that suit is commenced as a result of such payment default. The maker of each Seller Note shall have the right to prepay the principal without penalty at any time and from time to time.

**10.7    Closing Date**.  Closing on the purchase and sale of any Membership Interests purchased and sold under this Agreement shall be held at 1:00 P.M., Eastern Standard Time no later than the end of the thirty day period following the date on which Fair Market Value has been determined (the "**Closing Date**" or "**Closing**").  Closing shall be held at the offices of the Company, or at any other mutually agreeable location.

**10.8    Withdrawals.**  No Member may resign, dissolve or otherwise withdraw from the Company without the consent of all other Members.  The terms of this Section 10.8 are not intended to abrogate the provisions of the Act permitting withdrawal under the circumstances described in the Act, and such provisions shall apply notwithstanding this Section 10.8.

**10.9    Additional Members.**  The entirety of this Section 10.9 being subject to Section 4.7 and Section 6.8, from the date of the organization of the Company, any Person acceptable to the Board may become a Member in this Company by the issuance by the Company of a Membership Interest, including the issuance of Preferred Units, A Units, B Units, or other securities of the Company, as determined by the Board, for such consideration as the Board shall determine, subject to the terms and conditions of this Agreement.  Any such new Member shall execute and deliver to the Company an Additional Member and

24

Joinder Signature Page (a "**Joinder**") substantially in the form attached hereto as **Exhibit A**, pursuant to which such Person shall agree to be bound by the terms and conditions of this Agreement as a Member of the Company.  No new Members shall be entitled to any retroactive allocation of income, losses or expense deductions incurred by the Company.  The Members may, at the time a new Member is admitted, close the Company's books (as though the Company's tax year had ended) or make pro rata allocations of income, loss and expense deductions to a new Member for that portion of the Company's tax year in which the new Member was admitted in accordance with the provisions of Code Section 706(d) and the Regulations thereunder.  Promptly following the issuance of additional Membership Interests, the Secretary shall amend the books and records of the Company including Schedule A of this Agreement to reflect the Membership Interests issued and, in the case of Membership Interests issued other than in connection with the performance of services for the Company, the Capital Contribution or other consideration paid in respect of such Membership Interests.

      **10.10**    **Drag-Along Rights**.

        (a)    Actions to be Taken.  In the event that: (i) the Members holding at least a majority of the Preferred Units (the "**Preferred Dragging Members**"); and (ii) Members (who may be Preferred Dragging Members) holding a sufficient number of Membership Interests (other than Preferred Units) that, when added to the Preferred Units held by the Preferred Dragging Members, represent a majority of the Membership Interests (together with the Preferred Dragging Members, "**Dragging Members**") approve a Deemed Liquidation in writing, specifying that this Section 10.10 shall apply to such transaction, then each Member and the Company hereby agree:

        (1)    to vote all Membership Interests entitled to vote in favor of, and adopt, such Deemed Liquidation and to vote in opposition to any and all other proposals that could delay or impair the ability of the Company to consummate such Deemed Liquidation;

        (2)    if such transaction is a Stock Sale, to sell the same proportion of Membership Interests beneficially held by such Member as is being sold by the Dragging Members to the acquirer and, except as permitted in Section 10.10(b) below, on the same terms and conditions as the Dragging Members but taking into consideration any pricing differences between the Preferred Units, Common Unit and Profit Interest Units in recognition of the fact that if there were to be a liquidation of the Company, the amount received by the various Members under Section 11.4 may differ due to the classification of the Units they hold (e.g. Preferred Unit, Profit Unit). For the avoidance of doubt, all Members who hold similar Units receive the same per Unit price;

        (3)    to execute and deliver all related documentation and take such other action in support of the Deemed Liquidation as shall reasonably be requested by the Company or the Dragging Members in order to carry out the terms and provision of this Section 10.10, including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, unit certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents;

        (4)    not to deposit any Membership Interests in a voting trust or subject any Membership Interests to any arrangement or agreement with respect to the voting of such Membership Interests, unless specifically requested to do so by the acquirer in connection with the Deemed Liquidation;

        (5)    to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Deemed Liquidation;

44924252.v12

(6)    if the consideration to be paid in exchange for the Membership Interests pursuant to this Section 10.10 includes any securities and due receipt thereof by any Member would require under applicable law (A) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (B) the provision to any Member of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Member in lieu thereof, against surrender of the Membership Interests which would have otherwise been sold by such Member, an amount in cash equal to the fair value (as determined in good faith by the Company) of the securities which such Member would otherwise receive as of the date of the issuance of such securities in exchange for the Membership Interests; and

(7)    to consent to (A) the appointment by the Dragging Members of a Member to act on behalf of all Members in connection with such Deemed Liquidation (the "**Member Representative**"), (B) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (C) the payment of such Member's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Member Representative in connection with such Member Representative's services and duties in connection with such Deemed Liquidation and its related service as the representative of the Members, and to refrain from asserting any claim or commencing any suit against the Member Representative or any other Member with respect to any action or inaction taken or failed to be taken by the Member Representative in connection with its service as the Member Representative, absent fraud or willful misconduct.

(b)    Exceptions.  Notwithstanding the foregoing, a Member will not be required to comply with Section 10.10(a) above in connection with proposed Deemed Liquidation unless the liability for indemnification, if any, of such Member in the proposed Deemed Liquidation and for the inaccuracy of any representations and warranties made by the Company or its Members in connection with such proposed Deemed Liquidation, is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any Member of any of identical representations, warranties and covenants provided by all Members), and is pro rata in proportion to, and does not exceed, the amount of consideration paid to such Member in connection with such proposed Deemed Liquidation; provided that each Member shall be required to make representations and warranties only with respect to such Member and such Member's title to and ownership of Membership Interests and that such Member has the power and authority to convey title thereto free and clear of all liens, claims or encumbrances.

**10.11    Tag-Along Rights**.

(a)    In addition to, and not by way of limitation of the rights set forth in Section 10.10, if the Dragging Members propose to sell or otherwise Transfer all or a portion of such Member's or Members' Membership Interests in a bona fide arm's length transaction to a third party (in a sale consummated in a single Transfer or a series of related Transfers to a single purchaser or a group of purchasers as part of a single transaction or a group of related transactions), then the Dragging Members, as a condition to any such sale or Transfer, shall secure for the remaining Members an offer from the third party offeree(s) to purchase, at the same price per Membership Interest and on the same payment terms and conditions as apply to the Dragging Members, the same proportion of the respective Membership Interests owned by the remaining Members ("**Tag-Along Right**") but taking into consideration any pricing differences between the Preferred Units, Common Unit and Profit Interest Units in recognition of the fact that if there were to be a liquidation of the Company, the amount received by the various Members under Section 11.4 may differ due to the classification of the Units they hold (e.g. Preferred Unit, Profit Unit). For the avoidance of doubt, all Members who hold similar Units receive the same per Unit price.

26

(b)      In order to permit the remaining Members to exercise the Tag-Along Right, the Dragging Members shall notify the remaining Members in writing of the proposed sale or other Transfer giving rise to the Tag-Along Right (such writing, the "**Tag-Along Notice**").  The Tag-Along Notice shall set forth the terms and conditions of the proposed Transfer (the "**Third Party Terms**").  The Tag-Along Notice shall be submitted to the remaining Members at least forty-five (45) days prior to settlement of the proposed Transfer.

(c)      Upon receipt of a Tag-Along Notice, each remaining Member shall be entitled to sell or Transfer such remaining Member's respective proportional Membership Interests to the third party offeree(s) upon the Third Party Terms by providing written notice to the Company and the other Members of its intention to sell or Transfer (as applicable) such remaining Member's respective proportional Membership Interests within fifteen (15) business days of such remaining Member's receipt of the Tag-Along Notice.

(d)      Each Member hereby covenants and agrees that upon exercise of a Tag-Along Right: (i) such Member shall execute a release in form acceptable to the Company releasing the Company from any claims or potential claims by the Member, its respective shareholders, members, officers, and directors, and all contractual obligations, including any rights under applicable employment or labor laws; and (ii) take such actions and execute such documents and instruments as shall be necessary or appropriate to consummate any sale contemplated by this Section 10.11.

(a)      At the settlement of any sale or Transfer pursuant to this Section 10.11, the third party offeree(s) shall remit to each Member the consideration for the total sales price of the Membership Interest of such Member sold pursuant hereto.

**10.12    Stock Sales by Members**.   In the event that the Members, as a group, sell substantially all of their Units to a third party (the "**Purchaser**"), each Member shall have and receive that portion of the purchase price that such Member would have received had such Member been a Drag-Along Member notwithstanding any agreement to the contrary between any Member and the Purchaser.  Each Member covenants that if any purchase price payments in excess of the amounts that such Member is entitled to receive pursuant to this Section 10.12 come into such Member's possession, such Member will receive the same as trustee for those Members who have received less than the amounts that they are entitled to pursuant to this Section 10.12 (the "**Short-fall Members**"), and will immediately segregate such funds and deliver them pursuant to the joint written instructions of the Short-fall Members.

**10.13    Issuance of Units to Boniface or On Point**. If Robert Boniface or On Point is issued any Class B Units pursuant to Section 5.17, such issuance shall not affect the pro-rata portion of the Membership Interests held by the Preferred Members, and the Preferred Members shall be issued additional Preferred Units as are necessary so that the pro-rata portion of the Membership Interests held by the Preferred Members after issuance of any such Class B Units is equal to the pro-rata portion of the Membership Interests held by the Preferred Members immediately prior to the issuance of the Class B Units. The issuance of any additional Preferred Units pursuant to this Section 10.13 shall not increase or otherwise affect the Preference Amount or be deemed to be New Securities.

<div align="center">

**SECTION 11**
**DISSOLUTION**

</div>

**11.1    Events of Dissolution.**  Subject to Section 6.8 hereof, the Company shall continue until dissolved upon the earliest to occur of the following events (each, an "**Event of Dissolution**"):

(a)      A Sale of Assets;

<div align="center">27</div>

(b)      the consent of the Board to terminate and dissolve the Company; or

(c)      the entry of a decree of judicial dissolution under the Act.

**11.2    Liquidating Distributions.**  Upon an Event of Dissolution, a Person designated as a liquidating trustee (the "**Liquidating Trustee**"), shall take full account of the assets and liabilities of the Company as of the date of such Event of Dissolution and shall proceed with reasonable promptness to liquidate the Company's assets and terminate its business in accordance with the Act.  The cash proceeds from such liquidation, together with any other net assets of the Company (the "**Gross Liquidation Proceeds**"), shall be applied first to the to the satisfaction of the obligations of the Company, including those set forth in Section 7.6 and any loans owed to Members (whether by payment or by the making of reasonable provision for payment thereof), to the expenses of liquidation, and to the setting up of any Reserves for contingent, conditional and unmatured liabilities which the Board may consider necessary (collectively, the "**Obligations**").  "**Net Liquidation Proceeds**" means the Gross Liquidation Proceeds minus the Obligations.

**11.3    Required Transfers**.

(a)              Notwithstanding anything herein to the contrary, including the provisions of Section 10, and subject to the final paragraph of this Section 11.3(a), upon either a Stock Sale or an Event of Dissolution, if the Net Proceeds are $25,000,000 or less, then each of Jayme Bella and Sharon Neiburg on a proportionate basis with respect to their respective Membership Interests, immediately prior to the Stock Sale or the distribution of Net Liquidation Proceeds pursuant to Section 11.4 shall be deemed to have Transferred to each of the Members holding Preferred Units (on a proportionate basis with respect to their respective Preferred Units) the following percentages of Membership Interests of the Company free and clear of all liens and encumbrances on a fully-diluted basis based on the amount of net proceeds payable/available:

| Net Proceeds | Transfer Percentages |
|---|---|
| $25,000,000 | 3.00% |
| $24,000,000 | 4.00% |
| $23,000,000 | 5.00% |
| $22,000,000 | 6.00% |
| $21,000,000 | 7.00% |
| $20,000,000 | 10.00% |
| $19,000,000 | 12.00% |
| $18,000,000 | 15.00% |
| $17,000,000 | 18.00% |
| $16,000,000 | 21.00% |
| $15,000,000 or less | 25.00% |

If Net Proceeds fall between two consecutive break points in the above table, the amount of the interests to be assigned shall be determined by interpolating between the amounts on the adjoining rows of the above table as follows: *first*, determine the relative percentage that the Net Proceeds bears within the range of the next lower and next higher amounts of Net Proceeds in adjoining

28

rows of the table by forming a fraction the numerator of which is the amount by which Net Proceeds exceeds the lower end of the range and the denominator of which is the difference between the higher and the lower amounts of the range (the "**Relative Percentage**"); *second*, multiply the difference between the lower and higher amounts of **Transfer Percentages** set forth on those same rows of the table by the Relative Percentage; and *third*, add the amount so obtained to the Transfer Percentage that forms the lower end of the range, and the result so determined shall be the amount of Transferred Percentage.  For example, if Net Proceeds were $22.5 million, the Transferred Percentage would be 5.5% (*i.e.*, *first*, the Net Proceeds exceeds the lower end of the range by $500,000 and the difference between the ranges is $1,000,000; therefore, the Relative Percentage is 50%, *second,* the difference between lower and higher amounts of **Transfer Percentages** set forth on those same rows of the table is 1%, and *third* 50% of 1% is 0.5% which is added to the lower Transfer Percentage of 5% to equal 5.5%.

Notwithstanding anything to the contrary set forth in this Agreement, neither Jayme Bella nor Sharon Neiburg shall engage in any Transfers of their Membership Interests if such Transfer would leave the transferor unable to perform her obligations under this Section 11.3. Any such Transfer shall be void *ab initio*.

\* These percentages reflect a percentage all Membership Interests of the Company and are not intended to reflect only a percentage of a particular Member's Membership Interests of the Company.

(b)    If a Stock Sale or Event of Dissolution has not occurred by June 30, 2022 (the "**Sunset Date**"), the holders of Preferred Stock, on the one hand, and Jayme Bella and Sharon Neiburg, on the other shall meet following the Sunset Date to determine the Fair Market Value of the Company.  If the parties are unable to agree upon the Fair Market Value of the Company as of the Sunset Date within thirty (30) days following the Sunset Date, the Fair Market Value of the Company as of the Sunset Date shall be determined in the manner set forth in Section 10.5.

(c)    If the Fair Market Value as agreed upon or determined pursuant to Section 10.5 is greater than $25 million, then the obligations of Jayme Bella and Sharon Neiburg to make Transfers pursuant to this Section 11.3 shall terminate and this Section 11.3 shall be of no further force or effect.  If the Fair Market Value as agreed upon or determined pursuant to Section 10.5 is $25 million or less, then Jayme Bella and Sharon Neiburg shall be deemed to have made the Transfers required by Section 11.3 in the same amounts as would be required if the Net Proceeds were equal to such Fair Market Value; and Schedule A shall be amended to reflect such changes in the capital structure of the Company.  Following the recording of the deemed Transfers on Schedule A, Jayme Bella and Sharon Neiburg shall have no further obligations pursuant to Section 11.3 and this Section 11.3 shall be of no further force or effect.

**11.4    Liquidating Distributions**. Net Liquidation Proceeds shall be distributed to the Members in the following order of priority, taking into consideration the changes in the pro rata shares of the Members required by Section 11.3:

(a)    first to the Members holding of Preferred Units, pro rata, until distributions under this Section 11.4(a) equal, in the aggregate, $1,800,000.00 (the "**Preference Amount**") provided that the Preference Amount shall be reduced but not below zero to the extent that the aggregate of (i) the Preference Amount and (ii) distributions to the holders of the Preferred Units pursuant to Section 11.4(b) (the "**Preferred Pro Rata Share**") exceed the sum of $10,000,000.  By way of the first example if there are distributable proceeds of $28,5000,000, and the holders of the Preferred Units have 34.6% of all of the outstanding Units, then the Preferred Pro Rata Share would be $9,861,000 leaving a shortfall of $139,000 so the Preference Amount in this example would be $212,538.23 with the following result (i) $212,538.23

29

pursuant to Section 11.4(a) and (ii) $9,787,461.77 pursuant to Section 11.4(b) (i.e. $28,500,000 reduced by the Preference Amount leaves $28,287,461.77 x 34.6%) for a total distribution to the holders of the Preferred Units of $10,000,000.  The parties acknowledge that this is an iterative math computation because the Preference Amount reduces the Preferred Pro Rata Share and thus needs to be iterative until the $10,000,000 total distribution is achieved. The mathematical answer is achieved by dividing the initial shortfall amount by the reciprocal of the Preferred Pro Rata Share so $139,000/.654= $212,538.23.  For the avoidance of doubt, at any time the Preferred Pro Rata Share is in excess of $10,000,000, the Preference Amount will be zero; then

      (b)    to the Members pro rata in proportion to their respective Membership Interests; provided, however, that with respect to any Member holding Profits Interest Units, such Member shall not be entitled to share in distributions pursuant to this <u>Section 11.4</u> (and such Member's Profits Interest Units shall not be taken into account in calculating the Members' Membership Interests) until the other Members have received distributions pursuant to this <u>Section 11.4</u>  equal to the Distribution Threshold applicable to such Profits Interest Units. ''

    **11.5**    **Tax Termination.**  In the event of a termination of the Company for federal income tax purposes under Section 708 of the Code resulting from the transfer of an interest in the Company, the Company shall nevertheless remain in full force and effect hereunder and the Capital Accounts shall govern the constructive liquidation for federal income tax purposes and new Capital Accounts shall be redetermined in accordance with <u>Section 7.5</u>.

    **11.6**    **Certificate of Cancellation.**  Notwithstanding the dissolution of the Company, prior to the filing of a Certificate of Cancellation, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement. As soon as possible following the occurrence of an Event of Dissolution specified in <u>Section 11.1</u>, the appropriate representative of the Company shall execute a Certificate of Cancellation in such form as shall be prescribed by the Department of State of the Commonwealth of Pennsylvania in accordance with the Act and file such Certificate of Cancellation with the Department of State's office to dissolve the Company.

    **11.7**    **Final Capital Accounts**. The final Capital Account of each Member shall be determined, and profits or losses to the date of termination, including realized gain (whether or not recognized for tax purposes) or loss arising from a sale or other disposition, the taking by eminent domain or the damage and destruction of all or substantially all of the Company's assets, as well as unrealized gain or loss with respect to assets to be distributed in kind, shall be allocated as set forth in <u>Sections 9</u> and credited or charged to the Members' Capital Accounts.

    **11.8**    **Effect of Filing of Certificate of Cancellation.**  Upon the filing by the Department of State of the Commonwealth of Pennsylvania of a Certificate of Cancellation, the Company's existence shall cease, except for the purpose of legal actions, other proceedings and appropriate actions as provided for under the Act.

    **11.9**    **No Capital Contribution on Dissolution**.    Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, his Capital Contribution thereto, his Capital Account and his share of Net Profits or Net Losses, and shall have no recourse therefor (upon dissolution or otherwise) against any other Member. Accordingly, if any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which the liquidation occurs), then such Member shall have no obligation to make any Capital Contribution with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other person for any purpose whatsoever.

**11.10    Partial Liquidations.**   If prior to an Event of Dissolution, Capital Proceeds have been distributed pursuant to Section 11.4, then any subsequent distributions of Capital Proceeds or Net Liquidation Proceeds shall be aggregated with all prior distributions under Section 11.4 for the purpose of determining the Preference Amount as well as the amount, if any, of any Required Transfers pursuant to Section 11.3. For the avoidance of doubt, the purpose of this provision is to put all Members in the same position that they would have been in had all distributions of Capital Proceeds and Net Liquidation Proceeds occurred at the same time.

<div align="center">

**SECTION 12**
**MISCELLANEOUS**

</div>

**12.1    Notices.**   Unless otherwise provided in this Agreement, notices shall be deemed given if in writing and either delivered personally (with receipt acknowledged), mailed certified mail, return receipt requested, postage prepaid, mailed via overnight mail or sent via facsimile to the Member to whom the notice is to be given at such Member's address as set forth in Schedule A of this Agreement or such other address designated by such Member to the Board by notice hereunder.

**12.2    Waiver.**   No consent or waiver, express or implied, by any Member to or of any breach or default by any other Members in the performance by any other Members of his obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Members of the same or any other obligation of such Member hereunder.  Failure on the part of a Member to complain of any act or failure to act of any other Members or to declare such other Members in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member of its rights hereunder.

**12.3    Severability.**   If any of this Agreement or the application thereof to any person or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**12.4    Binding Agreement.**   Subject to the restrictions on Transfers set forth in Section 10.1 herein, this Agreement shall inure to the benefit of and be binding upon the Members and their respective executors, legal representatives, successors and assigns. None of the provisions of this Agreement is intended to be, nor shall the provisions be construed to be, for the benefit of any third party.  Whenever, in this Agreement, a reference to any party or Member is made, such reference shall be deemed to include a reference to the permitted heirs, executors, legal representatives, successors and assigns of such party or Member.

**12.5    Additional Remedies.**   The rights and remedies of any Member hereunder shall not be mutually exclusive, i.e., the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provisions hereof.

**12.6    Further Actions.**   Each of the Members hereby agrees to hereafter execute and deliver such further instruments and do such further acts and things as may be required or appropriate to carry out the intent and purpose of this Agreement and which are not inconsistent with the terms hereof.

**12.7    Prohibition Against Partition.**   Each of the Members hereby permanently waives and relinquishes any and all rights it may have to cause all or any part of any real property owned by the Company, or any other property or assets of the Company, to be partitioned, it being the intention of the Members to prohibit any Member from bringing a suit for partition against the other Members, or any of them.

<div align="center">

31

</div>

44924252.v12

**12.8    Use of Certain Terms.** The definitions in <u>Section 1</u> apply equally to both the singular and the plural; any pronoun shall include the corresponding masculine, feminine and neuter; the words `include" and "including" shall be deemed to be followed by the phrase "without limitation"; and the terms "hereof" and "herein" shall refer to the particular agreement or document in which such term appears.

**12.9    Counterparts; Signatures.** This Agreement may be executed in one or more counterparts with each such counterpart deemed to be an original hereof and all of such counterparts deemed to be one and the same Agreement. A signature to this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signature.

**12.10    Entire Agreement.** This Agreement contains the entire agreement From the parties hereto with respect to the Company.  No variations, amendments, modifications or changes herein nor any waiver of any provision hereof shall be binding except as provided in this Agreement.

**12.11    Amendments**. Except as otherwise provided by this Agreement, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and each of the Members. Any such written amendment or modification will be binding upon the Company and each Member. Notwithstanding the foregoing, amendments to the <u>Schedule A</u> following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Board without the consent of or execution by the Members.

**12.12    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania (other than its rules as to conflicts of law to the extent that such rules would result in the application of the laws of some other jurisdiction).

**12.13    Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the Commonwealth of Pennsylvania, in each case located in the City of Philadelphia and County of Philadelphia, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the Commonwealth of Pennsylvania. Each of the parties hereby irrevocably consents to the jurisdiction of such courts in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum. Service of process, summons, notice, or other document delivered pursuant to the provisions of <u>Section 12.1</u> shall be effective service of process for any suit, action, or other proceeding brought in any such court.

[*Signature Page Follows*]

44924252.v12

**IN WITNESS WHEREOF,** the parties hereto intending to be legally bound hereby, have executed this Agreement on the day and year above first written.

**COMPANY:**

Beacon Organics, LLC

By: _____

Name: Jayme Bella

Title: Manager

**MEMBERS:**

_____

Andrew M. Levine

_____

Victoria Longobardi

_____

Sharon Neiburg

_____

Rich Iannone

_____

Tommy Schuman

_____

Charles S.N. Crookenden

_____

Jayme Bella

VENTURESCOPE, LLC

By: _____

Name: Craig Karasin

Title: Sole Member/Manager

[Signature Page to Operating Agreement – Beacon Organics, LLC]

**IN WITNESS WHEREOF,** the parties hereto intending to be legally bound hereby, have executed this Agreement on the day and year above first written.

<div style="margin-left:40%">

**COMPANY:**

Beacon Organics, LLC

By:_____
Name: Jayme Bella
Title: Manager

**MEMBERS:**

_____
Andrew M. Levine

_____
Victoria Longobardi

_____
Sharon Neiburg

_____
Rich Iannone

_____
Tommy Schuman

_____
Charles S.N. Crookenden

_____
Jayme Bella

VENTURESCOPE, LLC

By:_____
Name: Craig Karasin
Title: Sole Member/Manager

</div>

[Signature Page to Operating Agreement – Beacon Organics, LLC]

**IN WITNESS WHEREOF,** the parties hereto intending to be legally bound hereby, have executed this Agreement on the day and year above first written.

**COMPANY:**

Beacon Organics, LLC

By:_____
Name: Jayme Bella
Title: Manager


**MEMBERS:**

_____
Andrew M. Levine

_____
Victoria Longobardi

_____
Sharon Neiburg

_____
Rich Iannone

_____
Tommy Schuman

_____
Charles S.N. Crookenden

_____
Jayme Bella

VENTURESCOPE, LLC

By:_____
Name: Craig Karasin
Title: Sole Member/Manager


[Signature Page to Operating Agreement – Beacon Organics, LLC]

**IN WITNESS WHEREOF,** the parties hereto intending to be legally bound hereby, have executed this Agreement on the day and year above first written.

**COMPANY:**

Absolute Organix LLC

By:_____
Name:
Title:


**MEMBERS:**

_____
Andrew M. Levine


_____
Victoria Longobardi


_____
Sharon Neiburg


_____
Rich Iannone


_____
Tommy Schuman


_____
Charles S.N. Crookenden


_____
Jayme Bella

VENTURESCOPE, LLC


By:_____
Name: Craig Karasin
Title: Sole Member/Manager


44924252.v4

**IN WITNESS WHEREOF,** the parties hereto intending to be legally bound hereby, have executed this Agreement on the day and year above first written.

**COMPANY:**

Beacon Organics, LLC

By:_____
Name: Jayme Bella
Title: Manager

**MEMBERS:**

_____

Andrew M. Levine

_____

Victoria Longobardi

_____

Sharon Neiburg

_____

Rich Iannone

_____

Tommy Schuman

_____

Charles S.N. Crookenden

_____

Jayme Bella

VENTURESCOPE, LLC

By:_____
Name: Craig Karasin
Title: Sole Member/Manager

[Signature Page to Operating Agreement – Beacon Organics, LLC]

**IN WITNESS WHEREOF,** the parties hereto intending to be legally bound hereby, have executed this Agreement on the day and year above first written.

**COMPANY:**

Beacon Organics, LLC

By:_____
Name: Jayme Bella
Title: Manager

**MEMBERS:**

_____
Andrew M. Levine

_____
Victoria Longobardi

_____
Sharon Neiburg

_____
Rich Iannone

_____
Tommy Schuman

_____
Charles S.N. Crookenden

_____
Jayme Bella

VENTURESCOPE, LLC

By:_____
Name: Craig Karasin
Title: Sole Member/Manager

[Signature Page to Operating Agreement – Beacon Organics, LLC]

**IN WITNESS WHEREOF,** the parties hereto intending to be legally bound hereby, have executed this Agreement on the day and year above first written.

**COMPANY:**

Beacon Organics, LLC

By:_____
Name: Jayme Bella
Title: Manager

**MEMBERS:**

_____
Andrew M. Levine

_____
Victoria Longobardi

_____
Sharon Neiburg

_____
Rich Iannone

_____
Tommy Schuman

_____
Charles S.N. Crookenden

_____
Jayme Bella

VENTURESCOPE, LLC

By:_____
Name: Craig Karasin
Title: Sole Member/Manager

[Signature Page to Operating Agreement – Beacon Organics, LLC]

## EXHIBIT A

**ADDITIONAL MEMBER JOINDER AND SIGNATURE PAGE**

In accordance with the terms of the Limited Liability Company Operating Agreement of Beacon Organics, LLC, a Pennsylvania limited liability company (the "***Company***"), made as of May __, 2017, as the same may be amended, restated, supplemented, and/or modified from time to time (the "***Agreement***"), the undersigned, who has received and/or purchased _____ Membership Interests of the Company, has agreed to join in and be bound by the terms and conditions of the Agreement, and has, intending to be legally bound thereby, executed this Additional Member Joinder and Signature Page to the Agreement on the day and year set forth below.

Name of Member: _____

Signature: _____

Print Name: _____

Title: _____
Address: _____
_____
_____
Telephone Number: _____
SSN/EIN: _____
Date: _____


Acknowledged and Accepted by:

Beacon Organics, LLC

By:_____
    Name:_____
    Title:_____

    Date:_____

Schedule A

Members; Addresses; Membership Interests

| Member | Address | Preferred Units | A Units | B Units | Profits Interest Units | Membership Interest as a Percentage |
|---|---|---|---|---|---|---|
| Andrew M. Levine | | 0 | 483,332 | 0 | 0 | 9.29% |
| Victoria Longobardi | | 0 | 0 | 400,000 | 0 | 7.69% |
| Sharon Neiburg | | 0 | 520,025 | 0 | 0 | 10.00% |
| Jayme L. Neiburg | | 0 | 1,275,313 | 0 | 0 | 24.53% |
| Rich Iannone | | 0 | 506,955 | 0 | 0 | 9.75% |
| Charles S.N. Crookenden | | 1,800,000 | 0 | 0 | 0 | 34.62% |
| Tommy Schuman | | 0 | 32,018 | 0 | 0 | 0.62% |
| VentureScope LLC | | 0 | 182,357 | 0 | 0 | 3.51% |
| Total: | | 1,800,000 | 3,000,000 | 400,000 | 0 | 100.00% |

**EXHIBIT B**

In preparing the Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "SOFAs"), the Debtor utilized the information available to it.  Due to the history of the case and the circumstances which led to the filing of this bankruptcy, the Debtor did not have access to, and could not get access to, its books and records.  In signing this Petition, the Schedules, and the SOFAs, Mr. Hallowell and counsel have relied on information which has been pieced together by the Debtor, its agents, attorneys and financial advisors with limited access to the Debtor's books and records and financial accounts.  Mr. Hallowell, the Debtor, its agents, attorneys, and financial advisors do not warrant or guarantee the accuracy and/or completeness of the information contained in the Schedules and SOFAs.  In fact, such parties assert that the information in the Schedules and SOFAs is incomplete and will need to be amended after access to the Debtor's books and records is obtained.  Thus, any signature appearing on the Petition, the Schedules and SOFAs and any oath relating thereto is to the best of the debtors' and its agents', representatives', and attorneys' knowledge and reasonable belief as of the filing of the petition and is subject to the foregoing limitations and reservations.